Steven C. YEAGER, et al., Petitioners,

v.

The Honorable Henry F.
GREENE, Respondent.

No. 85–601.

District of Columbia Court of Appeals.
Aug. 20, 1985.[1]
Opinion Dec 31, 1985.

James Klein and Mark S. Carlin, Washington, D.C., were on brief for petitioners.

Joseph E. diGenova, U.S. Atty., Michael W. Farrell, Linda Turner Hamilton, and Judith Hetherton, Asst. U.S. Attys., Washington, D.C., were on brief for respondent.

Before MACK, NEWMAN and TERRY, Associate Judges.

NEWMAN, Associate Judge:

This case presents a novel inquiry regarding the power of a judge of the Superior Court to issue and implement an order allowing, among other things, for jurors to submit written questions to be asked of witnesses during a criminal trial. Yeager and Wills are defendants in separate felony cases pending trial before Judge Henry F. Greene.[2] They filed a pretrial motion ob-

---

1. We entered an order denying the petition on August 20, 1985, with written opinion to follow.

2. Yeager and a codefendant, Anthony Mitchell, are charged with robbery of a Peoples Drug Store on August 5, 1982. Joe Wills is charged with burglary, theft, and assault with intent to rape on February 3, 1984. Joe Wills' codefend-

ant, Dione Wills, is charged with accessory after the fact to burglary, accessory after the fact to theft, and receiving stolen property. Although Mitchell and Dione Wills joined orally in the proceedings below, they are not named as petitioners in the petition for writ of mandamus. The trial proceedings of all four defendants

jecting to certain criminal trial procedures established by Judge Greene allowing jurors to submit written questions at the conclusion of a witness' testimony. Following a hearing, Judge Greene issued a detailed written order denying the motion and upholding his established procedures.

Yeager and Wills now seek a writ of mandamus directing Judge Greene to vacate the order.[3]

## I

### Factual Background

Judge Greene disseminated a Memorandum to those attorneys scheduled to appear before him on his felony trial calendar. The Memorandum detailed several trial procedures that he proposed to follow. Among those cited were three with which Yeager and Wills took issue: (1) permitting, but not requiring, jurors to take notes; (2) admonishing the jury in advance as to the purpose of closing arguments, the propriety of argument, and the impropriety of the expression of personal beliefs or opinions by counsel during argument; and (3) explaining to jurors that they are discouraged from posing written inquiries to witnesses (because questioning of witnesses is generally the responsibility of counsel and the presiding judge), but setting forth a procedure to be followed in the event a juror did have a question.[4]

Yeager filed a pretrial motion seeking to bar implementation of these procedures. A similar motion was filed by Wills. The pleadings were consolidated for disposition of the common issues, and arguments thereon were heard by the trial court at a hearing on January 28, 1985.[5]

Following lengthy oral argument before Judge Greene, he issued a Memorandum and Order (Order) upholding continued usage of the enunciated procedures.[6] The court found the arguments of Yeager and Wills without merit, stating that "no feder-

---

have been continued pending the resolution of this petition.

**3.** Although the writ of mandamus is technically used as a form to require an official to perform an affirmative, mandatory action, the petitioners in the present case seek to have a writ of mandamus issued to vacate a procedural order of a judge. Traditionally, such an action would take the form of a prohibitory writ as opposed to mandamus. However, there is little, if any, problem presented by the terminology used in labeling the writ; a writ may be postured "mandamus" or "prohibition" without affecting the nature of the remedy sought. *See* 16 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE 2D: JURISDICTION § 3932 at 206–07 (1982).

**4.** The issue which the present petition for writ of mandamus challenges specifically is item (3) of the above-cited pretrial Memorandum written by Judge Greene. The Memorandum further detailed the following procedures for submission of written questions by jurors to witnesses:

At the outset of trial, I will instruct the jury that (1) generally only the lawyers and I question witnesses and jurors are not encouraged to do so, (2) jurors nevertheless will be permitted to submit questions, but only in writing and not orally, (3) their questions must first be submitted to the court so that I may discuss them with counsel before posing them

to a witness, (4) they may pose a question only to elicit information from a witness and not to discredit or argue with a witness, and (5) if I fail to ask a question submitted by a juror it is because the question was not legally proper, and the juror who submitted the question should not guess or speculate as to what the answer might have been.

**5.** Subsequent to the consolidation of the pleadings, the codefendants of Yeager and Wills orally joined the motions. In support of their motion, Yeager and Wills contended that the procedures set forth by Judge Greene were (1) without support in this jurisdiction and elsewhere; (2) an unconstitutional infringement upon their fifth and sixth amendment rights to a fair trial and impartial jury; (3) inconsistent with the adversarial system of fact finding in criminal litigation; and (4) unduly burdensome and unworkable in the present circumstances. Conversely, the government argued that implementation of the procedures developed by Judge Greene was a matter committed to the court's discretion.

**6.** *See* Order, *United States v. Mitchell, et al.,* No. F–1003–84, March 12, 1985 attached hereto as an Appendix. Although the Order addressed the validity of all three procedures to which petitioners originally took issue, the petition for a writ of mandamus challenges only the trial court's procedure regarding juror questions.

al or state court has found cause to question the constitutionality of the procedure, and almost all courts have found selection of the procedure to be firmly committed to the discretion of the trial judge." Order at 31.

In upholding the validity of the juror question procedure, the trial court examined several cases from other jurisdictions holding that trial courts had not erred in allowing jurors to submit written questions to witnesses in criminal trials. Specifically, the trial court adopted the rationale set forth by the Fifth Circuit in *United States v. Callahan,* 588 F.2d 1078 (5th Cir.), *cert. denied,* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979), stating that the formulation of such procedures rests within the sound discretion of the trial judge absent a statute or rule of court to the contrary. *Callahan, supra,* 588 F.2d at 1086–87. The trial court then detailed several "sound reasons to permit the questioning of witnesses by jurors if the procedure is undertaken with careful judicial control." [7]

The Order also outlined safeguards which would be observed in implementing the juror question procedure. The court first acknowledged the existence of a potential danger in allowing jurors to pose questions to witnesses, but concluded that any such danger is avoided if the trial judge "exercises careful control over the process from the outset of trial." Order at 24. Moreover, the court emphasized the importance of jurors not being permitted to proffer oral questions, and noted that the identity of the juror who posed a particular question must be concealed as contrary practices would interfere with the litigation process.

Second, the court cautioned that questions submitted by jurors should first be discussed with counsel, out of the presence of the jury, prior to approval so that counsel are provided an adequate opportunity for objection and review. *Id.* at 25. The court also noted that if a juror's question is approved and asked of a witness, "counsel should be afforded the opportunity to ask additional questions in any areas that might be opened by the jurors' question(s) or the witness's [sic] answer(s) to the question(s)." *Id.* at 26.

Finally, the court concluded that questions may only be submitted at the close of the witness' examination "so as to avoid interrupting or distracting counsel or other jurors, and to maximize the possibility that issues of concern to jurors will be addressed by counsel's examination and therefore will not prompt unnecessary inquiries by jurors." *Id.* at 25–26.

On April 10, 1985, Yeager noted an appeal from the pretrial ruling (No. 85–509), and on May 21, 1985, Yeager and Wills filed their petition for a writ of mandamus. On May 29, 1985, this court directed Judge Greene to file a response to the petition. By letter of July 15, 1985, Judge Greene advised this court that he would seek leave of the court to respond to the petition if he thought such a response necessary after the United States filed its response. The United States filed an opposition to the petition on July 19, 1985. Neither Judge Greene nor petitioners Yeager and Wills have filed additional pleadings.

## II

The writ of mandamus is a part of the more general class of prerogative or "extraordinary" writs. The All Writs Act, 28 U.S.C. § 1651(a) (1982), prescribes the general statutory authority for courts of appeals to issue an extraordinary writ when "necessary or appropriate in aid of their

---

7. *See* Order at 20–23. Judge Greene noted the following as reasons for permitting juror questions to witnesses: (1) such a procedure "makes good common sense" as it may clarify questions in the juror's mind; (2) "counsel and the court both may be alerted to particular factual issues that need exploration or more development";

(3) "improper concerns," such as irrelevant inquiries of jurors, may be "promptly addressed with cautionary instructions"; and (4) "the increased effectiveness of communication with jurors that will result if they are permitted to pose questions to witnesses will aid in finding the truth." *Id.*

respective jurisdictions and agreeable to the usages and principles of law."

■ Although a definitive standard for issuance of a writ of mandamus to a lower court has never been stated, traditionally the writ has been invoked by appellate courts only under "exceptional circumstances amounting to a judicial 'usurpation of power'." *Will v. United States*, 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967) (quoting *DeBeers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 217, 65 S.Ct. 1130, 1132, 89 L.Ed. 1566 (1945)). The party seeking the writ must demonstrate a "clear and indisputable" right to have the writ issue. *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 384, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953) (quoting *United States v. Duell*, 172 U.S. 576, 585, 19 S.Ct. 286, 288, 43 L.Ed. 559 (1899)). However, it has been noted that "where a matter is committed to discretion it cannot be said that a litigant's right to a particular result is 'clear and indisputable.'" *Allied Chemical Corp. v. Daiflon*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980) (per curiam).

The Supreme Court has repeatedly refused to issue a writ of mandamus where there has been no showing that a lower court has exceeded its authority or failed to exercise appropriate jurisdiction over a matter. *Will v. United States, supra*, 389 U.S. at 95, 88 S.Ct. at 273; *Parr v. United States*, 351 U.S. 513, 520, 76 S.Ct. 912, 917, 100 L.Ed. 1377 (1956); *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943). Moreover, in *Bankers Life & Cas. Co., supra*, 346 U.S. at 383, 74 S.Ct. at 148, the Court refused to issue a writ, even though the lower court

ruling may have been erroneous, so long as there was no abuse of judicial power and appellate review was available after final judgment. *See also Parr, supra*, 351 U.S. at 520, 76 S.Ct. at 917.

Pursuant to the All Writs Act, this court has authority to issue the extraordinary writ of mandamus to the Superior Court of the District of Columbia. *See United States v. Kronheim*, 80 A.2d 280 (D.C. 1951); *Morrow v. District of Columbia*, 135 U.S.App.D.C. 160, 165–67, 417 F.2d 728, 733–35 (1969); *see also* 28 U.S.C. § 1651 (1982). We have recognized the writ of mandamus as an extraordinary remedy which may not be implemented as a substitute for an appeal and generally will not issue such a writ unless appellate review is unavailable. *People's Counsel of the District of Columbia v. Public Service Commission*, 414 A.2d 516, 518 (D.C.1980); *Neighborhood Legal Services Program v. Ryan*, 276 A.2d 728, 729 (D.C.1971). Moreover, in criminal cases, we have emphasized that a writ of mandamus is to be used sparingly, noting that its primary use is " 'to confine [a].... court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so'". *Bowman v. United States*, 412 A.2d 10, 12 (D.C.1980) (quoting *Roche v. Evaporated Milk Ass'n, supra*, 319 U.S. at 26, 63 S.Ct. at 941.[8]

Yeager and Wills seek to justify the issuance of a writ of mandamus on the grounds that Judge Greene had no "discretionary" authority to invite juror questioning of witnesses in criminal cases. They urge this court to dispense with traditional prerequisites to the use of mandamus and issue the writ for "supervisory" or "adviso-

---

**8.** In *Bowman,* although this court discussed the appropriateness of a "supervisory" writ (to block the compelled disclosure of a defendant's planned defense), we cautioned against the grant of such extraordinary writs in criminal cases, and in lieu of issuance advised the trial court to vacate the challenged order without the pressure of a writ of mandamus. For other cases wherein this court has considered writs of mandamus under the traditional requirements, *see Poteat v. King,* 487 A.2d 215 (D.C.1984)

(mandamus appropriate to correct deficiencies in preliminary hearing); *Anderson v. Sorrell,* 481 A.2d 766 (D.C.1984) (mandamus appropriate where trial judge ordered pretrial psychiatric examination despite defendant's waiver of insanity defense); *but see United States v. Harrod,* 428 A.2d 30 (D.C.1981) (en banc) (court held that an order requiring a complaining witness to undergo a psychiatric examination was not appealable and declined to consider the appeal as a petition for writ of mandamus).

ry" purposes prior to a final judgment in these cases. In support of this proposition, they rely upon Supreme Court decisions in two civil cases, *La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), and *Schlagenhauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964).[9]

In *La Buy* a writ of mandamus was issued by the court of appeals to a federal district judge requiring him to vacate certain procedural orders which were directly in conflict with the Federal Rules of Civil Procedure.[10] Although we agree with Yeager and Wills that the holding in *La Buy* suggests an appellate court may issue a "supervisory" writ of mandamus to review certain interlocutory rulings, we find that *La Buy* cannot be read to sanction the issuance of such writs in every circumstance amounting to what may later prove to be an erroneous order. The Court in *La Buy* limited its decision to the "exceptional circumstances" existing in that case, hav-

ing found an abusive pattern which amounted to both an egregious abuse of discretion and a threatened disruption of the proper administration of justice. *La Buy, supra,* 352 U.S. at 255–59, 77 S.Ct. at 313–15.

Similarly in *Schlagenhauf, supra,* 379 U.S. at 104, 85 S.Ct. at 234, the Supreme Court carved out another narrow exception to the traditional prerequisites for the issuance of mandamus. The Court held that mandamus was available, on a one-time basis, to provide guidance on the operation of a new rule of procedure ("advisory" mandamus).[11] However, the holding in *Schlagenhauf* cannot be read broadly to provide an alternate route for the issuance of mandamus. Any reading of *Schlagenhauf* reveals that "advisory" mandamus was granted only because the facts involved a substantial allegation of usurpation of power regarding an order issued by a judge pursuant to a newly promulgated rule of procedure having no precedent from

---

**9.** It is relevant to our analysis to note that *La Buy* and *Schlagenhauf* were civil cases wherein mandamus was approved as a means of policing compliance with procedural rules. The Supreme Court has never approved the use of the writ to review an interlocutory procedural order in a criminal case which did not have the effect of a dismissal. *See Will v. United States, supra,* 389 U.S. at 98, 88 S.Ct. at 275.

**10.** In *La Buy,* the Court, over four dissenters, approved issuance of the writ by the United States Court of Appeals for the Seventh Circuit as a method of "supervisory control of the District Courts ... necessary to proper judicial administration in the federal system." 352 U.S. at 259–60, 77 S.Ct. at 315. The district judge in *La Buy,* invoking the exceptional procedures of Fed.R.Civ.P. 53(b), had referred two complex, civil antitrust cases to a special master for resolution of essentially all the issues in the cases, resulting in what the Court termed "an abdication of the judicial function depriving the parties of a trial before the court on the basic issues involved in the litigation." *Id.* at 256, 77 S.Ct. at 313. The excessive and improper use of masters by the district courts in the Seventh Circuit had been a problem for years, but had continued despite repeated admonitions by the court of appeals. *Id.* at 258, 77 S.Ct. at 314. Under these circumstances, the Supreme Court held that mandamus was available to curb the dis-

trict court's "clear abuse of discretion" under Rule 53(b). *Id.* at 256–57, 77 S.Ct. at 313–14.

**11.** *Schlagenhauf v. Holder* involved the first challenge to a district court's power under Fed. R.Civ.P. 35(a) to require medical examinations of a defendant in a civil case. The district court had ordered a defendant to submit to nine separate medical examinations on the basis of a petition by one of the other defendants without any hearing on the matter. The Supreme Court noted that the challenge to the district court's lack of power to issue such a ruling was a "substantial allegation of usurpation of power ... [and is] an issue of first impression that called for the construction and application of Rule 35 in a new context." 379 U.S. at 111, 85 S.Ct. at 239. The Court held that "under these unusual circumstances," the court of appeals "had the power to review on a petition for mandamus the basic, undecided question of whether a district court could order the mental or physical examination of a defendant." *Id.* at 110, 85 S.Ct. at 238. The Court cautioned, however, that once it had set guidelines for the interpretation of Fed. R. Civ. P. 35(a) in *Schlagenhauf,* mandamus would not lie in a future case to challenge application of those guidelines, when all that could be claimed was that a district court had erred in ruling on a matter within its jurisdiction. *Id.* at 112, 85 S.Ct. at 239.

which the judge may have been guided in issuing the interpretative order. *Id.* at 111–12, 85 S.Ct. at 238–39.

■ In the present case, Judge Greene's ruling was not issued in willful disregard of any procedural rules and does not threaten to disrupt the orderly administration of justice in the trial court to bring it within the context of the *La Buy* decision. The rationale of the *Schlagenhauf* decision is equally inapplicable. The order issued by Judge Greene providing procedures for juror questions was within his authority and was supported by precedent and sound reasoning—it by no means amounted to such an egregious abuse of the court's discretion to bring it within the limited exceptions of these two cases.

The Superior Court Rules of Criminal Procedure expressly give discretion to the trial court to promulgate rules regarding courtroom procedures "in any lawful manner" where no other rule or statute specifically prohibits such a practice or provides for a contrary practice to be implemented.[12] There are no rules or statutes governing the procedures to be used in questioning witnesses in criminal trials. Judge Greene's policy of allowing jurors to submit written questions to witnesses does not appear to be an abuse of his authority granted by Rule 57 to conduct witness questioning "in any lawful manner." Judge Greene does not allow jurors to question witnesses directly. Written questions are screened by the court before being asked. Counsel are allowed to object to proposed questions outside of the presence of the jury. The entire procedure appears designed to allow jurors to ask relevant questions while minimizing the risk of improper questions. Moreover, the Federal Rules of Evidence recognize the authority of a trial court judge to control the manner and order of questions put to witnesses,[13] and several federal[14] and State[15] appellate courts have approved ju-

---

**12.** Rule 57(b) of the Superior Court Rules of Criminal Procedure provides, in pertinent part:
PROCEDURE NOT OTHERWISE SPECIFIED. If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute.
This court has recognized that comparable Federal Rules of Procedure may be consulted for guidance in construing Superior Court Rules. *See generally In re D.M.R.,* 373 A.2d 235 (D.C.1977). As the government notes, the Advisory Committee Note to the identical federal rule suggests that the drafters of the Rule specifically intended it to give trial courts considerable discretion in implementing procedures relating to the conduct of jury trials:
While the rules are intended to constitute a comprehensive procedural code for criminal cases in the federal courts, nevertheless it seemed best not to endeavor to prescribe a uniform practice as to some matters of detail, but to leave the individual courts free to regulate them, either by local rules or by usage. Among such matters are the mode of impaneling a jury, the manner and order of interposing challenges to jurors, the manner of selecting the foreman of a trial jury, the manner of sealed verdicts, the order of counsel's arguments to the jury, and other similar details.
FED.R.CRIM.P. 57 advisory committee note.

**13.** FED.R.EVID. 611(a) provides, in pertinent part:

The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to ... make the interrogation and presentation effective for the ascertainment of the truth.... FED.R.EVID. 614(a) specifically recognizes the trial court's authority to call witnesses on its own or at the suggestion of a party, and FED.R.EVID. 614(b) acknowledges the trial court's power to interrogate witnesses, whether called by itself or by a party. While the Federal Rules of Evidence are not generally applicable to the Superior Court of the District of Columbia, we have had occasion to consider them as authoritative on issues of the law of the District of Columbia. *See, e.g., Laumer v. United States,* 409 A.2d 190, 198–99 (D.C.1979).

**14.** *See United States v. Callahan, supra,* 588 F.2d at 1086. The court held that "the procedure employed of requiring jurors to put their questions in writing and clear their relevancy with the court was not an abuse of the court's discretion to conduct the trial fairly." *Id.* (citing *United States v. Witt,* 215 F.2d 580, 584 (2d Cir.)), *cert. denied,* 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954); *United States v. Gonzales,* 424 F.2d 1055 (9th Cir.1970).

**15.** *See, e.g., State v. LeMaster,* 137 Ariz. 159, 669 P.2d 592 (1983); *People v. Gates,* 97 Cal.App.3d Supp. 10, 158 Cal.Rptr. 759 (1979); *Cheeks v. State,* 266 Ind. 190, 361 N.E.2d 906, 910 (1977);

ror question procedures virtually identical to the one at issue here.

■ For these reasons the "abuse of discretion" argument of Yeager and Wills fails to persuade us to issue a writ of mandamus.[16] They will have adequate opportunity to seek appellate review of any particular assertion of prejudice on the specifics of their cases if they are convicted.[17]

As stated by our order of August 20, 1985, the petition is denied.

## APPENDIX A

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Criminal Division—Felony Branch

———

Criminal Case No. F 1003–84

UNITED STATES OF AMERICA

v.

ANTHONY J. MITCHELL

———

Criminal Case No. F 3074–84

UNITED STATES OF AMERICA

v.

DIONE WILLS

———

*State v. Taylor,* 25 Ariz.App. 497, 544 P.2d 714 (1976); *People v. Vertin,* 56 Mich.App. 669, 224 N.W.2d 705, 710–11 (1974). No other jurisdiction has struck down a controlled policy of allowing jurors to submit written questions to witnesses. The only cases where juror questioning of witnesses has resulted in reversal have involved unsupervised in-court oral questions asked directly to the witness. *See State v. Jeffries,* 644 S.W.2d 432 (Tenn.App.1982); *State v. Martinez,* 7 Utah 2d 387, 326 P.2d 102 (1958). Even direct oral questioning has been upheld in some cases. *See People v. McAlister,* 167 Cal. App.3d 633, 213 Cal.Rptr. 271 (1985); *Scheel v. State,* 350 So.2d 1120 (Fla.App.1977).

**16.** Yeager and Wills nonetheless argue that allowing jurors to question witnesses is unconstitutional, and inherently prejudicial to criminal defendants. It is asserted that the questioning process transforms the jurors from "passive observers" to "active inquisitors" in violation of the defendant's sixth amendment right to an impartial jury and the fifth amendment right to due process and fundamental fairness in criminal cases. We find such an argument unpersuasive. Yeager and Wills do not cite any legal authority to support their arguments. Their fears of prejudice to criminal defendants have not been realized in practice. Judge Greene used the juror question procedure in 25 felony trials between January 7, 1985, and July 5, 1985. (*See* Appendix B of the Government's Response to the Petition For Writ of Mandamus). Jurors asked questions in only 9 of the 25 cases. Three of the four convictions are now being appealed, but the juror question procedure has not been

asserted as error in any of these cases. *Id.* Therefore, given that the juror question procedure has been adopted and approved in other jurisdictions, and does not appear to be prejudicing defendants or generating appeals, petitioners' constitutional claim for supervisory mandamus must fail.

**17.** We agree with the government's contention that the present action to vacate Judge Greene's Order does not fall within the "collateral-order" exception to the final judgment rule. The Order of Judge Greene was not one "affecting rights that will be irretrievably lost in the absence of immediate appeal." *See Richardson-Merrell, Inc. v. Koller,* —— U.S. ——, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985); *see also Flanagan v. United States,* 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984); *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 374, 101 S.Ct. 669, 673, 66 L.Ed.2d 571 (1981); *Helstoski v. Meanor,* 442 U.S. 500, 506–08, 99 S.Ct. 2445, 2448–49, 61 L.Ed.2d 30 (1979); *Abney v. United States,* 431 U.S. 651, 660–62, 97 S.Ct. 2034, 2448–49, 52 L.Ed.2d 651 (1977). *See generally Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949) (enunciating the elements that must be present for a case to fall within the collateral-order rule).

In both cases, petitioners have failed to bring their challenge within the very narrow collateral-order exception to this court's appellate jurisdiction as prescribed by D.C.Code § 11–721(a)(1). *See, e.g., United States v. Harrod, supra,* 428 A.2d at 30; *West v. United States,* 346 A.2d 504 (D.C.1975).

Criminal Case No. F 1071–84

UNITED STATES OF AMERICA

v.

JOE WILLS

Criminal Case No. F 4815–82

UNITED STATES OF AMERICA

v.

STEVEN C. YEAGER

## MEMORANDUM AND ORDER

These matters are before the court for consideration of defendant Yeager's request, joined in by his co-defendant, Anthony Mitchell, and by co-defendants Dione Wills and Joe Wills in another unrelated case,[1] that the court *not* utilize certain procedures during defendants' trials, in-

cluding (1) permitting but not requiring jurors to take notes, (2) admonishing the jury in advance of closing arguments as to their purpose and as to the propriety of argument and the impropriety of the expression of personal beliefs or opinions by counsel during argument, and (3) explaining to jurors that while it normally is the responsibility of the lawyers and the judge to pose questions to witnesses during a trial and the jury is not encouraged to pose questions nor permitted to put questions orally, there nevertheless is a proper procedure to follow in the event a juror does have a question to ask.[2]

For the reasons which follow, defendants' "Motions"[3] that these procedures not be followed in this case are denied; however, the court is persuaded that its pre-closing argument instruction and remarks to the jury concerning the posing of questions should be modified in certain respects to ameliorate some concerns addressed by counsel.

1. Mr. Yeager's co-defendant in this case, Mr. Mitchell, indicated through counsel at the hearing of this matter on January 28, 1985, that he tentatively wished to join in Yeager's request, and counsel confirmed that position at a status hearing of the two cases on February 19, 1985. Meanwhile, Yeager's counsel, David DeBruin, Esquire, representing Mr. Joe Wills in a separate case, filed on Wills' behalf a request similar to that he had earlier filed on behalf of Yeager. At a status hearing of the cases of Joe and Dione Wills on February 19, 1985, Mr. Joe Wills' counsel indicated that he, too, wished to join in Mr. DeBruin's requests. Since the issues raised are virtually identical as to all cases, the cases have been consolidated for the limited purpose of a ruling on defendants' requests.

The government has filed no written response to defendants' Oppositions, but advised the court at the hearings of these matters on January 28 and February 19, 1985, of its view that it was entirely within the court's discretion whether to follow the procedures challenged by the defendants.

2. A description of these procedures and how they work is set out in a "Memorandum to Attorneys in Felony Cases Before Me" (hereafter, "Memorandum"). The Memorandum is served on all counsel at the time of arraignment in cases before this court. A more detailed

explanation, with accompanying jury instructions, is contained in *Materials on Special Jury Techniques* (hereafter, *"Materials"*), originally prepared in April, 1984, for a Training Seminar for Judges of the Superior Court, and revised and expanded in November, 1984, for presentation to a Training Seminar for new Judges of the Court.

Counsel for both the defendants and the government have received copies of the Memorandum, and both lead counsel also are aware of the more detailed explanation of the procedures contained in the *Materials,* inasmuch as both the United States Attorney's Office and the Public Defender Service have received copies of the *Materials.*

For the reader's convenience, relevant portions of the Memorandum and the *Materials* are set out, where appropriate, in footnotes at the beginning of the discussion of each procedure opposed by the defendants.

3. While defendants Yeager and Joe Wills filed no formal motions, at the conclusion of their Oppositions each requested that his "motion be granted." The court therefore has construed each defendant's Opposition as a motion requesting a ruling that the procedures in issue not be utilized during his trial, and has assumed that the other defendants join in the motions.

## NOTE TAKING BY JURORS [4]

In the most recent edition of its *Standards for Criminal Justice*, the American Bar Association reflected what it acknowledged to be the "trend toward permitting note-taking [by jurors]" in "Trial By Jury" Standard 15–3.2, which provides:

4. As to note taking by jurors, the Memorandum advises counsel:

During the course of the trial jurors will be permitted to take notes in spiral notebooks which will be made available to them. During recesses, jurors will leave the notebooks on their seats and, if the court is not otherwise in session, the courtroom will be locked. At the end of the day during overnight recesses, the notebooks will be collected by the marshal or clerk and delivered to me. I will retain the notebooks during all such recesses and have the marshal or clerk deliver them back to the jury when trial resumes. At the end of the trial the jurors will be permitted to take their notebooks to the juryroom during deliberations. At the end of the deliberations and after the jurors have returned their verdict, they will be told to tear out any notes from the notebooks, and to deliver the notes to the foreperson; the foreperson then will deliver the notes to me and I will destroy them. The jurors will be advised that at no time during or after the trial will I or anyone else examine their notes. The jurors also will be told that they are not required to take notes, that they should not do so if note taking would distract them from giving full time and attention to the testimony and evidence in the case, and that the notebooks are made available to them merely as a convenience in the event they wish to take notes.

The *Materials* include the following preliminary and final instructions concerning note taking, which are given in each case:

*Preliminary Instruction to Jury Where Note Taking Is Permitted*

LET ME NOTE FIRST THAT WHEN YOU TOOK YOUR SEATS, YOU FOUND A NOTEBOOK AND PENCIL WAITING FOR YOU. THAT IS BECAUSE I PERMIT JURORS IN THIS COURTROOM TO TAKE NOTES DURING THE TRIAL IF THEY WANT TO, AND TO HAVE THEIR NOTES WITH THEM DURING DELIBERATIONS.

NOW I WANT TO EMPHASIZE THAT NONE OF YOU ARE REQUIRED TO TAKE NOTES. INDEED, YOU SHOULD NOT DO· SO IF YOU THINK THAT NOTE TAKING MIGHT DISTRACT YOUR ATTENTION FROM THE EVIDENCE OR THE TESTIMONY OF THE WITNESSES IN THE CASE. ON THE OTHER HAND, IF YOU THINK THAT TAKING NOTES MIGHT BETTER FOCUS YOUR ATTENTION ON THE WITNESSES AND THE EVIDENCE, OR MIGHT BETTER HELP YOU TO RECALL WHAT WENT ON DURING THE TRIAL, YOU MAY FEEL FREE TO TAKE NOTES.

YOU SHOULD REMEMBER THAT YOUR NOTES ONLY ARE INTENDED TO BE A HELP TO YOUR MEMORY. THEY SHOULD NOT TAKE PRECEDENCE OVER YOUR OWN INDEPENDENT RECOLLECTION OF THE EVIDENCE. MOREOVER, THOSE JURORS WHO DO NOT TAKE NOTES SHOULD RELY ON THEIR OWN MEMORY OF THE EVIDENCE AND SHOULD NOT BE INFLUENCED BY THE FACT THAT ANOTHER JUROR HAS TAKEN NOTES, SINCE THE NOTES ONLY ARE FOR THE NOTE TAKER'S PERSONAL USE IN REFRESHING HIS OR HER MEMORY OF THE EVIDENCE.

WHENEVER THERE IS A RECESS IN THE TRIAL, PLEASE LEAVE YOUR NOTEBOOKS AND PENCILS ON YOUR SEATS. THEY WILL BE LEFT THERE DURING SHORT RECESSES WHEN I REMAIN ON THE BENCH OR THE COURTROOM IS LOCKED, AND THEY WILL BE COLLECTED DURING OVERNIGHT RECESSES AND GIVEN TO ME TO KEEP. AT NO TIME DURING OR AFTER THE TRIAL WILL ANYONE, INCLUDING MYSELF, LOOK AT ANY OF YOUR NOTES. AT THE END OF THE TRIAL, AFTER YOU HAVE FINISHED YOUR DELIBERATIONS, I WILL ASK THAT EACH OF YOU TEAR OUT YOUR NOTES FROM YOUR NOTEBOOK AND GIVE THEM TO YOUR FOREPERSON. IN TURN, I WILL ASK THE FOREPERSON TO· GIVE ME YOUR NOTES, AND I WILL DESTROY THEM IMMEDIATELY AFTER THE RETURN OF YOUR VERDICT. AGAIN, NEITHER I NOR ANYONE ELSE WILL LOOK AT ANY NOTES YOU HAVE TAKEN.

*Final Instruction to Jury Where Note Taking Is Permitted*

NOW, DURING THE TRIAL I HAVE PERMITTED THOSE JURORS WHO WANTED TO TO TAKE NOTES. YOU MAY TAKE YOUR NOTES WITH YOU TO THE JURY ROOM AND USE THEM DURING YOUR DELIBERATIONS IF YOU WISH. AS I TOLD YOU AT THE BEGINNING OF THE TRIAL, YOUR NOTES ONLY ARE INTENDED TO BE AN AID TO YOUR MEMORY AND SHOULD NOT TAKE PRECEDENCE OVER YOUR OWN INDEPENDENT RECOLLECTION. THOSE JURORS WHO HAVE NOT TAKEN NOTES SHOULD RELY ON THEIR OWN MEMORY OF THE EVIDENCE AND SHOULD NOT BE INFLUENCED BY THE FACT THAT ANOTHER JUROR HAS TAKEN NOTES, SINCE THE NOTES ARE ONLY FOR THE NOTE TAKER'S OWN PERSONAL USE IN ASSISTING HIS OR HER MEMORY OF THE EVIDENCE.

AT THE END OF YOUR DELIBERATIONS, PLEASE TEAR OUT FROM YOUR NOTE-

Jurors may take notes regarding the evidence presented to them and keep these notes with them when they retire for their deliberations. Such notes should be treated as confidential between the juror making them and other jurors. American Bar Association, *Standards for Criminal Justice* (2nd ed. 1978) (hereafter "ABA Standards"), "Trial By Jury", 15–3.2.

The comment to the A.B.A. Standard notes its "thrust" to be "to permit note taking by jurors *as a matter of right without permission of the court*" (emphasis added), and states that not only the "great majority of the states that have ruled on the question permit the trial court, in its discretion, to allow jurors to take notes regarding the evidence presented at trial", but that "the federal courts 'have held uniformly that the trial judge may, in his [or her] discretion, permit the practice.'" ABA Standards, "Trial By Jury", 15–3.2, Commentary, pp. 15–84 and 15–85. Thus, the Judicial Conference Committee on the Operation of the Jury System observed a quarter-century ago:

> BOOKS ANY NOTES YOU HAVE MADE AND GIVE THEM TO YOUR FOREPERSON. THE CLERK WILL COLLECT YOUR NOTEBOOKS AND PENCILS WHEN YOU RETURN TO THE COURTROOM, AND I WILL ASK THE FOREPERSON TO GIVE ME YOUR NOTES WHEN YOUR VERDICT IS RETURNED. I WILL DESTROY YOUR NOTES IMMEDIATELY AFTER THE TRIAL AND NO ONE, INCLUDING MYSELF, WILL LOOK AT THEM.

5. Over a period of several months in the spring of 1982, this court sent letters and accompanying questionnaires to nearly 200 jurors who had sat during the previous five months on misdemeanor cases in which note taking was permitted. The survey was intended to ascertain, *inter alia,* whether the jurors had found it helpful to be able to take notes during trials. 94 responses were received to 196 mailed questionnaires, the vast majority of which indicated a strong preference by jurors to be able to take notes. Moreover, the responses included comments reflecting each of the reasons indicated in the text in support of the jurors' views. The results of the survey are included in the *Materials,* and the portion of the survey with reference to note-taking by jurors (including all comments received) is included as *Appendix A* to this Memorandum and Order.

Trial jurors should, in the discretion of the trial judge, be permitted to take notes for use in their deliberations regarding the evidence presented to them, and to take these notes with them when they retire for their deliberations. When permitted to be taken they should be treated as confidential between the juror taking them and his fellow jurors. *Report of the Judicial Conference Committee on the Operation of the Jury System,* 26 F.R.D. 424 (1960).

The reasons which favor permitting jurors to take notes during criminal and civil trials seem to this court both obvious and compelling. Notes assist jurors in recalling the evidence and the instructions, help some jurors to better understand and to focus attention on the testimony and evidence, aid jurors in organizing their thoughts during deliberations, and probably clarify issues during jury deliberations. Moreover, it seems likely that permitting jurors to take notes may insure a fuller discussion of relevant issues during jury deliberations.[5]

In their "Opposition to Note-taking by Jurors", defendants concede that note tak-

There is empirical support for what would seem to be the self-evident propositions that (1) left only with their memories to rely upon, jurors' ability to accurately recall courtroom testimony is highly problematical, (2) note taking enhances recall even where the note taker does not retain his or her notes at the time recall is tested, (3) notes are a form of "external storage" available for review and reference at a later time, and (4) subjects who take notes and are provided with an opportunity to review them prior to a test of recall perform better than those who take notes and are not permitted to review them before such a test. *A fortiori,* it would appear that note takers who are able to retain their notes during a test of recall (*e.g.,* jurors during jury deliberations after a trial) will be better able to remember what transpired than non-note takers. *See* Harris, Teske and Ginns, "Memory for Pragmatic Implications from Courtroom Testimony", 6 *Bulletin of the Psychonomic Society,* 494, 496 (1975) ("The results of this study offer discouraging reflections of jurors' memories of courtroom testimony"); DiVesta and Gray, "Listening and Note Taking", 63 *Journal of Educational Psychology* 8 (1972); Carter and Van Matre, "Note Taking vs. Note Having", 67 *Journal of Educational Psychology* 900 (1975).

ing is an aid to jurors' memories, but contend that its utility in this regard is greatest in a long and complex case. "Opposition", p. 2. They cite no reasons or authority, however, to conclude that it would not be of significant utility in a shorter case. In fact, both empirical evidence for periods as short as single lectures (*see* note 5, *supra*), as well as the practicalities of even "short" trials in the Felony II Branch of the Criminal Division of this Court (which are frequently broken up and recessed after only brief periods of testimony in order to handle a large volume of status hearings, probation revocations, sentences, and other "short" matters), indicate that note taking would be likely to facilitate the ability of jurors to recall testimony in criminal trials in the Superior Court.

Defendants dismiss the prospect that note taking by jurors will better focus their attention on the testimony and evidence in the case as "not obvious." "Opposition", *supra*. This oblique viewpoint is not shared, however, by those who have studied or participated in the process of taking notes during trial. Rather, both commentators and jurors have attested to this advantage of juror not taking. *See* note 5, *supra; Appendix* A; Petroff, *The Practice of Jury Notetaking—Misconduct, Right, or Privilege?*, 18 Okla.L.Rev. 125 (1965).

Finally, defendants assert that a third "purported advantage" of note taking—minimizing the occasions on which a jury might require further instructions or information from the court during deliberations—should be viewed "as an argument against the practice of note-taking in many cases" because jurors should be "encouraged" to communicate with the court during

ing deliberations. "Opposition", *supra.* The court agrees that jurors should not be *discouraged* from communicating with the court during deliberations. However, defendants' argument is specious; it postulates, in essence, that jurors should be encouraged to communicate with the court at the end of trial to help them understand matters that they likely would have understood earlier if they had been allowed to do what defendants oppose—take notes and submit questions to witnesses (*see* pp. 987–994, *infra*). Moreover, defendants' argument misses the point that the reason to encourage juror communication is to enhance juror understanding. Thus, defendants would encourage juror communication with the court *only* at a time (*i.e.*, during deliberations after all of the evidence is in) when the court can be *"least* responsive to their concerns, invariably meeting their substantive questions about testimony or evidence with unresponsive reminders that "all of the evidence is in" or they "must rely on" their "recollection of the evidence." Yet, defendants oppose jurors taking notes or submitting questions during trial, when both their comprehension and recollection could be meaningfully aided.

Defendants' other arguments against permitting jurors to take notes—(1) that jurors who take better notes will be more influential, (2) that only a small number of jurors will be able to take notes because of the skills required, (3) that inaccurate notes may be taken and relied upon, (4) that jurors will be distracted from focusing on the testimony and evidence if they take notes, and (5) that note taking may "prematurely inject jurors into the deliberative process" ("Opposition", pp. 2–4)—all constitute unsupported assumptions by defendants. Yet, defendants reject those authorities who have refuted these assumptions [6]

**6.** *See, e.g., United States v. Chiarella,* 184 F.2d 903, 907 (2d Cir.1950) (Hand, L., J.); *ABA Standards, supra;* Petroff, *The Practice of Jury Notetaking—Misconduct, Right, or Privilege?, supra; Note,* 18 Univ. of Pitt.L.Rev. 800 (1957); *The Jury System in the Federal Courts,* 26 F.R.D. 409, 457–58 (1961); *Report of the Judicial Conference Committee on the Operation of the Jury System,*

*supra; Should Jurors Be Allowed to Take Notes?,* 32 J.Am.Jud.Socy. 57 (1948).

*None* among the sparse array of cases cited by defendants in support of their arguments in opposition to note taking actually disapprove of the practice where it is in accord with the procedures followed by this court. Indeed, *Harris v. United States,* 261 F.2d 792 (9th Cir.1958) ("Op-

as relying on "glib comment, not analysis." "Opposition", p. 2.

As to the first four of these arguments, the court finds persuasive the Commentary to "Trial By Jury" standard 15–3.2 of the *ABA Standards, supra:*

As to the argument that a juror armed with notes may dominate others, it is said that certain jurors are likely to be more influential in any event. [Citation omitted.] "That conflicts of memory existed before notes were taken and, nevertheless, were reconciled in deliberation certainly is indicative that some means was utilized to influence the dissenter and thus achieve unanimity." [Citation omitted.] It is also argued that undue influence is unlikely today when the vast majority of jurors are literate, so that

each juror might support his or her own position with his or her own notes. [Citation omitted.] As to the contention that the case might turn on an imperfectly written note, it is said that "[t]his argument begs the question" because the case might likewise turn on imperfect memory.[7] [Citation omitted.] Similarly, while it is claimed that one feature of the case may receive emphasis over others, "this is a danger necessarily inherent in the jury system, and is hardly increased by the fact that a juror takes a note." [Citation omitted.] As to the argument that note taking will distract a juror, the response is that taking notes concentrates one's attention on the testimony. [Citation omitted.] Falsification by a dishonest juror is said to be "equally feasible, be it done by means of a written memo or a spoken word." [Citation

position", p. 1), while noting that many trial judges disapprove the practice, nevertheless concluded that note taking [o]rdinarily ... is within the sound discretion of the trial judge and does *not* constitute error"—particularly where, as in *Harris,* the trial court *"carefully instructed the jury in the first instance and in the final charge of the limitations on the use of notes."* 261 F.2d at 796. (Emphasis added.) *Johnson v. United States,* 398 A.2d 354 (D.C.1979) ("Opposition", p. 1) contains no discussion whatsoever of note taking by jurors. *United States v. Standard Oil Co.,* 316 F.2d 884 (7th Cir.1963) ("Opposition", p. 3) disapproved only of the practice of a trial judge *compelling* jurors to take notes, and concluded that even compulsory note taking without advance notice to counsel before trial did not constitute reversible error in that case. 316 F.2d at 896–97. Finally, *People v. DiLuca,* [85 A.D.2d 439] 448 N.Y.S.2d 730 (App.Div., 2nd Dept.1982) ("Opposition", pp. 2–3), in a thorough and lucid discussion of the issue, concluded that the trial judge erred by permitting jurors to take notes *only* during the summations and instructions *after* the evidence was in, and *without* any advice or instructions "with respect to taking of notes [or] ... the proper use thereof." 448 N.Y.S.2d at 732. However, the *DiLuca* court went on to observe that (1) in the Federal courts, absent an abuse of discretion, it "is within a trial court's province to allow a jury to take notes", (2) the "trend among the states is also to allow jurors to take notes", and (3) the decision as to whether jurors should be permitted to take notes "is properly left to the discretion of the trial court" which, if it permits note taking, must do so with certain mandatory cautionary instructions *almost identical to those given by*

*this court.* 448 N.Y.S.2d at 732–35. *Compare* note 4, *supra.*

Recently the Criminal Procedural Rules Committee of the Supreme Court of Pennsylvania, chaired by Professor James Strazella, recommended to that Court rule changes that would permit note taking by jurors. The rule proposed by Professor Strazella's committee was accompanied by a thorough and detailed report, both of which were published in the *Pennsylvania Bulletin* (vol. 14, no. 37, Sept. 15, 1984) and are included as *Appendix B* to this Memorandum and Order. (*See also* 479 A.2d Adv.Sht. No. 2 at pp. CCXXIII–CCXXXV, Sept. 21, 1984.)

7. Defendants reject this analogy, asserting that the "whole point of notes influencing deliberations is that because they purport to be memorializations of what was actually said they will *appear* to carry more weight than the unrecorded recollection of jurors who have not taken notes. Even if the notes are accurate, their existence will render more influential those persons on the jury who have produced such memorializations." "Opposition", pp. 2–3. (Emphasis in original.)

Defendants' argument in this regard is wholly speculative and unsupported by any authority. Moreover, this court carefully instructs jurors *both* preliminarily and at the conclusion of trial that "those jurors who do not take notes should rely on their own memory of the evidence and should not be influenced by the fact that another juror has taken notes, since the notes only are for the note taker's personal use in refreshing his or her memory of the evidence." *See* note 4, *supra.*

,omitted.] Also, it has been observed that if there should be a conflict in the notes, it could easily be resolved by a request for a reading of the record. [Citation omitted.] Finally, those who favor note taking by jurors point out that memory is fallible and that notes are a valuable aid in recollecting evidence. [Citation omitted.] *ABA Standards,* "Trial By Jury" 15–3.2, *supra* at 15–86.

Defendants' last assertion—that note taking may prematurely involve jurors in the deliberative process ("Opposition", p. 4)—presupposes that jurors do not and should not begin to think about the evidence they are hearing until they retire to deliberate. This "sponge" theory of juror behavior—that jurors are or should be wholly passive absorbers of information that they only begin to sift and reflect upon following final instructions—not only is unsupported by authority, but relies upon an assumption wholly at odds with common sense and what we know about how trials work. Indeed, the facts that the law *requires* that jurors be given various instructions during the course of the trial— about the limited purposes for which certain evidence is to be considered, for example—and that many commentators favor even a preliminary instruction to the jury before trial,[8] suggest that we understand and anticipate that jurors not only hear but think during the course of a trial. That jurors are told not to discuss or deliberate concerning a case during a trial hardly means that they are not to consider and weigh the evidence and testimony as it is presented to them. To suggest that aiding jurors in this task by permitting them to write notes about what they hear somehow will taint the deliberative process because it will encourage them to think about and remember what they hear strikes this court as an argument uniquely devoid of merit.

It is no more novel a concept to the jurisprudence of litigation than to the psychology of education (*see* note 5, *supra*) that note taking enhances the ability to recall of those charged with the responsibility of listening. Trial judges who hear cases as factfinders without juries, and who are called upon daily to make the "mixed" fact-law determinations required by most rulings on motions, take notes to assist their recall—and they of course do so without serious legal challenge. Similarly, trial counsel routinely take notes for future reference in the examination and cross-examination of witnesses, and in anticipation of argument to the jury. We rely upon court clerical personnel to take notes of what transpires in court so as to enhance the accuracy of official record entries. Indeed, our law of evidence presumes that notes not only may refresh the recollection of a witness, but are admissible, where properly authenticated, as evidence of the witness's exhausted past recollection. *See, e.g., McCormick on Evidence,* pp. 17–22, 299–303 (3rd ed. 1984).

As short shrift would be given to arguments that note taking by a judicial factfinder distracts the judge's attention from the demeanor and credibility of witnesses, or that note taking by trial counsel results in ineffective assistance for like reasons, so should we view skeptically similar assertions about jurors who, in accord with detailed and careful instructions,[9] are told that they are permitted—but not required—to 'take notes to assist them in their attention to the trail and recollection of the evidence.

Defendants have been unable to assert any credible ground upon which to conclude that they will be prejudiced or their interests in any way impaired by permitting jurors to take notes during their trials. Consequently, their requests that note taking by jurors not be permitted during their trials will be denied.[10]

---

**8.** *See Criminal Jury Instructions for the District of Columbia,* Instruction No. 1.02 and *Comment,* pp. 4–8 (3rd ed., 1978).

**9.** *See* note 4, *supra.*

**10.** Defendants assert that if note taking by jurors is permissible at all, it is permissible only within the court's discretion, and that such discretion must be meaningfully exercised on a

## PRE–CLOSING ARGUMENT INSTRUCTION TO JURY

As defendants readily acknowledge in their pleadings, the District of Columbia Court of Appeals has had frequent occasion to address its concern about improprieties in closing arguments by counsel in criminal cases.[11] Defendants infer from the fact that these opinions almost invariably have dealt with arguments by the prosecution that the only problem that exists "is the problem of *prosecutorial* misconduct and argument." "Opposition", p. 5. (Emphasis in original.) This court, based upon observations during more than two years

assigned to the trial of criminal cases, must reject defendants' inference. Rather, it seems quite clear that while the Court of Appeals only has occasion to consider allegations of improper prosecutorial argument because defendants *may* raise such issues on appeal and the government *may not* seek reversal based on improper argument by defense counsel,[12] nevertheless the problem of counsel overstepping the line and expressing personal beliefs or opinions during argument is as endemic to one side as the other in the trial of criminal cases.[13]

In an effort to alert both juries and counsel to the impropriety of the expression of

---

case-by-case basis. Assuming *arguendo* that defendants are correct, their arguments that in these cases discretion should be exercised to preclude note taking because the trials will be short and the credibility of witnesses will be the primary factual issue to be resolved by the juries are not persuasive. Even "short" felony trials in Superior Court sometimes take several days to complete because of the volume of other matters which a trial judge must handle, and the impact of delays on jurors may be exacerbated further by weekend recesses. *See* pp. 982–983, *supra.* More significantly, determining who is telling the truth in a criminal trial is a far more complex question than defendants would have it, and is the very kind of issue whose resolution might benefit from note taking by jurors, who thereby might be better able to recall inconsistencies in the testimony of single witnesses or between different witnesses, the apparent bias of a witness, whether a witness understood a particular question, what a witness's relation was to another witness or to a party, or whether a witness had a good memory or was a careful observer.

Consequently, to the extent the determination as to whether to permit jurors to take notes is a decision committed to the court's discretion on a case-by-case basis, this court is of the view that in these cases discretion should be exercised in favor of permitting jurors to take notes.

**11.** It would serve no purpose here to catalog the virtually scores of cases over the past twenty years in which the appellate court has confronted allegations of improper prosecutorial argument and ruled that the contested argument constituted reversible error, harmless error, or fair argument. What is significant for the purposes of this discussion is that such allegations are raised with great frequency on appeal, often seem to present "close" questions, and therefore, presumably, consume substantial appellate resources in their resolution.

**12.** Recently the Supreme Court had occasion to recognize the concerns presented by improper argument by both prosecution and defense counsel in *United States v. Young*, — U.S. —, [105 S.Ct. 1038, 84 L.Ed.2d 1] 53 U.S.L.Wk. 4159 (1985). The Court noted that "[o]f course, when defense counsel employs tactics which would be reversible error if used by a prosecutor, the result may be an unreviewable acquittal." [— U.S. at —, n. 6, 105 S.Ct. at 1043, n. 6] 53 U.S.L.Wk. at 4161, n.6.

**13.** In *Young, supra,* note 12, the Court commented on the *mutual* obligations of prosecution and defense counsel that constitute a logical underpinning for this court's pre-closing argument instruction:

It is clear that counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds. Just as the conduct of prosecutors is circumscribed, "[t]he interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders." *Sacher v. United States,* 343 U.S. 1, 8 [72 S.Ct. 451, 455, 96 L.Ed. 717] (1952). *Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case.* See, *e.g.,* ABA Code of Professional Responsibility DR 7–106(C)(3) and (4), ... ABA Model Rules of Professional Conduct, Rule 3.4(e) (1983). Defense counsel, like his adversary, must not be permitted to make unfounded and inflammatory attacks on the opposing advocate. [— U.S. at —, 105 S.Ct. at 1043] 53 U.S.L.Wk. at 4161. (Emphasis added.)

This court has observed that counsel in civil cases are as likely as counsel in criminal cases to engage in improper argument. Thus, the court gives an instruction identical to that complained of here prior to closing arguments in civil trials.

personal beliefs or opinions by counsel in their arguments to the jury, to discourage such impropriety, and to add emphasis and effect to admonitory or curative instructions that might be required where such improprieties occur, this court routinely gives the following instruction to the jury immediately before closing arguments in civil and criminal cases:[14]

LADIES AND GENTLEMEN, WE ARE NOW ABOUT TO HEAR CLOSING ARGUMENTS IN THIS CASE. AS I TOLD YOU AT THE BEGINNING OF THE CASE, CLOSING ARGUMENTS, LIKE THE OPENING STATEMENTS OF THE LAWYERS, ARE NOT EVIDENCE. THEY ARE STATEMENTS BASED ON THE EVIDENCE AND ARE INTENDED TO HELP YOU UNDERSTAND THE EVIDENCE. THEY ARE THE LAWYERS' CHANCE TO TRY TO PERSUADE YOU AND TO DEMONSTRATE TO YOU WHAT THE EVIDENCE HAS SHOWN.

NOW BEFORE COUNSEL ARGUE TO YOU I WANT YOU TO UNDERSTAND THAT THERE IS A DIFFERENCE BETWEEN ARGUMENTS BY A LAWYER AND THE EXPRESSION OF OPINION BY A LAWYER. IT IS ENTIRELY PROPER—INDEED, IT IS THE VERY PURPOSE OF THIS PART OF A TRIAL—FOR A LAWYER TO ARGUE TO YOU THOROUGHLY AND VIGOROUSLY CONCERNING WHAT THE EVIDENCE SHOWS IN THIS CASE. AT THE SAME TIME, HOWEVER, A LAWYER IS NOT PERMITTED TO EXPRESS HIS OR HER PERSONAL OPINION OR BELIEF DURING CLOSING ARGUMENT. THE REASON, OF COURSE, IS BECAUSE IT IS NOT A LAWYER'S OPINION AS TO THE FACTS IN THIS CASE—OR INDEED, AS I HAVE TOLD YOU EARLIER, MY OPINION—THAT SHOULD HAVE ANY BEARING ON YOUR CONSIDERATION OF THE CASE; OUR OPINIONS OR BELIEFS AS TO THE FACTS OR THE EVIDENCE OR THE CREDIBILITY OF WITNESSES ARE NOT RELEVANT. RATHER, IT IS YOUR DECISION, BASED UPON WHAT THE EVIDENCE SHOWS, THAT MATTERS IN REACHING YOUR VERDICT.

THUS, WHILE IT IS SOMETIMES DIFFICULT TO DRAW A PRECISE LINE BETWEEN WHAT IS THE EXPRESSION OF OPINION BY A LAWYER AND WHAT IS ARGUMENT BY A LAWYER, YOU NEVERTHELESS MUST TRY TO UNDERSTAND THE DIFFERENCE. AND YOU MUST GIVE YOUR FULLEST AND MOST CAREFUL ATTENTION TO THE LAWYERS' ARGUMENTS, WHILE AT THE SAME TIME DISREGARDING ANY OPINION WHICH A LAWYER MIGHT EXPRESS DURING ARGUMENT.

Defendants complain that the giving of this instruction is unwarranted, fails to distinguish between argument and opinion, and adds to the jury's burden the assessment of each counsel's statements during argument to determine whether they constitute argument or opinion. This, defendants assert, imposes an essentially judicial function upon the jury without the benefit of any clear standard, and will result in jurors being confused and defendants being deprived of their right to enjoy effective closing arguments as part of their Sixth Amendment right to the effective assistance of counsel at trial.

Defendants' arguments that the instruction in issue is unwarranted are belied by both this court's experience and the frequency with which alleged improper argument has been the subject of appellate scrutiny. Likewise, the contention that jurors will have inordinate difficulty distinguishing between the concepts of argu-

---

**14.** The court's Memorandum to Counsel apprises counsel of the precise language of the instruction and when it will be given to the jury. *See* Memorandum, p. 983. Because of its timing, of course, as a practical matter it occurs immediately before the prosecutor's closing argument.

ment and the expression of opinion is not very persuasive when assessed in the context of criminal trials in which jurors are required, *inter alia*, to decide whether the government has carried the burden of proof "beyond a reasonable doubt", to consider evidence only for limited purposes (*e.g.*, impeachment), and to understand what is and is not evidence. Indeed, it would seem that the concepts of argument and the expression of opinion are more likely to be within the ken of average jurors than many of the words and phrases with which jurors are confronted during a trial.[15] Moreover, defendants' apprehension that jurors will be likely to focus their attention on trying to distinguish between opinion and argument rather than listening to the arguments themselves strikes the court as a more fanciful than realistic concern.

Nevertheless, it is quite clear, as defendants assert, that it is the responsibility of the court, not the jury, to remain alert to improper expressions of personal belief or opinion by counsel and to admonish counsel and instruct the jury when such expressions occur. Thus, while the court is of the view that a salutary purpose is served by an instruction in advance of closing arguments which tells the jury that such a distinction exists and that it places limits on counsel, it would seem that nothing further is accomplished by directing the *jury* to make the distinction. Rather, by giving a more limited instruction the court can alert both counsel and the jury in the presence of both,[16] thereby hopefully discouraging any improper argument before it takes place. Moreover, the court can be assured that the giving of the instruction

will have provided added emphasis to any subsequent curative instruction that might be required, without risking that jurors will be confounded or confused by being told that it is *their* responsibility to draw the line between argument and opinion. Consequently, this court will give the pre-closing argument instruction to which defendants object, but in a modified version with somewhat simplified language that (1) emphasizes the impropriety of the expression of *personal* beliefs or opinions by counsel, (2) omits any direction to the jury to distinguish between argument and opinion, and (3) inserts in place of the existing last paragraph a simple admonition to the jury to give its fullest and most careful attention to the lawyers' closing arguments. The instruction will be given as follows:

LADIES AND GENTLEMEN, WE NOW ARE ABOUT TO HEAR CLOSING ARGUMENTS IN THIS CASE. AS I TOLD YOU AT THE BEGINNING OF THE CASE, CLOSING ARGUMENTS OF THE LAWYERS, JUST LIKE THEIR OPENING STATEMENTS, ARE NOT EVIDENCE IN THIS CASE. THEY ARE ARGUMENTS BASED ON THE EVIDENCE AND THEY ARE INTENDED TO HELP YOU UNDERSTAND THE EVIDENCE. THEY ARE THE LAWYERS' CHANCE TO TRY TO PERSUADE YOU AND DEMONSTRATE TO YOU WHAT THE EVIDENCE HAS SHOWN.

BEFORE THE LAWYERS ARGUE TO YOU, I WANT TO TELL YOU THAT THERE IS A DIFFERENCE BETWEEN ARGUMENTS BY A LAWYER AND THE EXPRESSION OF PERSONAL BELIEFS OR OPINIONS BY A LAW-

---

15. *See* Partridge and Lynn, Appendix B to *Pattern Jury Instructions*, "Report of the Federal Judicial Center Committee to Study Criminal Jury Instructions" (June, 1982), where the authors note numerous "uncommon words" (those used less frequently than ten times per million words of writing) used in jury instructions. Notably, neither "argument" nor "opinion" are found among "uncommon words" in the work upon which Mssrs. Lynn and Partridge relied. *See* Thorndike and Lorge, *The Teacher's Word Book of 30,000 Words*, pp. 10, 129 (Bureau of Publications, Teachers College, Columbia University, 1944).

16. *Compare* Instruction No. 1.13, *Criminal Jury Instructions for the District of Columbia* (3rd ed., 1978), "Instruction to Expert Witness in Cases Involving the 'Insanity Defense'", which is required to be given to an expert psychiatric witness in the presence of both the jury and the witness.

YER. IT IS ENTIRELY PROPER—INDEED IT IS THE VERY PURPOSE OF THIS PART OF A TRIAL—FOR A LAWYER TO ARGUE TO YOU THOROUGHLY AND VIGOROUSLY ABOUT WHAT THE EVIDENCE SHOWS IN THIS CASE. AT THE SAME TIME, HOWEVER, A LAWYER MAY NOT EXPRESS A PERSONAL BELIEF OR PERSONAL OPINION DURING ARGUMENT. THE REASON, OF COURSE, IS BECAUSE IT IS NOT A LAWYER'S PERSONAL BELIEF OR OPINION— JUST AS I HAVE TOLD YOU EARLIER IT IS NOT MY PERSONAL BELIEF OR OPINION—THAT MATTERS IN THIS CASE. ANY PERSONAL BELIEF OR OPINION THAT I OR THE LAWYERS MIGHT EXPRESS AS TO THE FACTS OR THE TESTIMONY OR THE EVIDENCE SHOULD NOT AFFECT YOUR CONSIDERATION OF THIS MATTER. THE ONLY THING THAT SHOULD MATTER IN YOUR DELIBERATIONS IS WHAT YOU DECIDE THE EVIDENCE HAS SHOWN, AND YOUR VERDICT(S) MUST BE BASED ONLY ON THE EVIDENCE.

WE NOW WILL HEAR FROM COUNSEL, AND I ASK YOU TO GIVE THEIR ARGUMENTS YOUR FULLEST AND MOST CAREFUL ATTENTION.

## SUBMISSION OF QUESTIONS TO WITNESSES BY JURORS [17]

In *United States v. Callahan*, 588 F.2d 1078, 1086 (1979), Judge Charles Clark

**17.** As to the submission of questions to witnesses by jurors, the court's Memorandum advises counsel:

Jurors in cases before me will be permitted to submit written questions to be posed to a witness after counsel and the court complete examining the witness.

At the outset of the trial, I will instruct the jury that (1) generally only the lawyers and I question witnesses and jurors are not encouraged to do so, (2) jurors nevertheless will be permitted to submit questions, but only in writing and not orally, (3) their questions must first be submitted to the court so that I may discuss them with counsel before posing them to a witness, (4) they may pose a question only to elicit information from a witness and not to discredit or argue with a witness, and (5) if I fail to ask a question submitted by a juror it is because the question was not legally proper, and the juror who submitted the question should not guess or speculate as to what the answer might have been.

The jurors will be told that a juror should raise his or her hand at the conclusion of a witness's testimony if the juror has a written question to be posed to the witness. If a juror submits a question, I will not disclose to the jury which juror submitted the question (although in some instances it will be self-evident). If I decide to pose the question to the witness after I consult with counsel, counsel will have an opportunity to ask additional questions in any areas that might be opened by the juror's question or the witness's answer to the question.

The *Materials* include the following preliminary instruction concerning submission of questions, which is given in each case:

*Instruction to Jurors Concerning Submission of Questions to Witnesses*

GENERALLY ONLY THE LAWYERS AND I ASK QUESTIONS OF WITNESSES. IF YOU ARE CONCERNED ABOUT WHETHER A WITNESS WILL TESTIFY ABOUT A MATTER THAT SEEMS IMPORTANT TO YOU, USUALLY, IF YOU ARE PATIENT, THE MATTER WILL BE COVERED BY FURTHER QUESTIONS ASKED BY ME OR THE LAWYERS. OCCASIONALLY, HOWEVER, A JUROR FEELS THAT AN IMPORTANT QUESTION HAS NOT BEEN ASKED.

NOW I AM NOT ENCOURAGING ANY OF YOU TO POSE QUESTIONS TO THE WITNESSES IN THIS CASE. HOWEVER, IF IT HAPPENS DURING TRIAL THAT YOU FEEL AN IMPORTANT QUESTION HAS NOT BEEN ASKED, YOU MAY WRITE OUT THE QUESTION ON A BLANK PIECE OF PAPER FROM YOUR NOTEBOOK, RAISE YOUR HAND WHEN THE LAWYERS ARE FINISHED WITH THEIR EXAMINATION OF THE WITNESS, AND HAVE THE QUESTION HANDED TO ME. I WILL THEN DECIDE IF THE QUESTION IS A PROPER ONE AFTER CONSULTING WITH THE LAWYERS. IF IT IS, AND IF IT RELATES TO A FACTUAL MATTER ABOUT WHICH THE WITNESS CAN TESTIFY, I WILL ASK THE QUESTION OF THE WITNESS.

IF I DO NOT ASK THE QUESTION, THAT MEANS THAT I HAVE DETERMINED THAT IT IS NOT LEGALLY PROPER, PERHAPS BECAUSE IT IS CUMULATIVE OR WOULD CALL FOR HEARSAY OR OPINION, OR FOR SOME OTHER SUCH REASON. IF I DO NOT ASK THE QUESTION, THE JUROR POSING IT SHOULD NOT GUESS OR SPECULATE CONCERNING WHAT THE ANSWER MIGHT

wrote for a unanimous panel of the Fifth Circuit:

> There is nothing improper about the practice of allowing occasional questions from jurors to be asked of witnesses. If a juror is unclear as to a point in the proof, it makes good common sense to allow a question to be asked about it. If nothing else, the question should alert trial counsel that a particular factual issue may need more extensive development. Trials exist to develop truth. It may sometimes be that counsel are so familiar with a case that they fail to see problems that would naturally bother a juror who is presented with the facts for the first time.

The view expressed by the Fifth Circuit in *Callahan* reflects the position taken by most state and all federal courts which have addressed the issue that whether jurors should be permitted to submit questions to witnesses rests within the sound discretion of the trial judge, in the absence of a statute or rule of court.[18] The rare cases resulting in reversals as a result of juror questioning *all* have involved the posing of *oral* questions in open court, and, with one apparent exception in the single state which prohibits the practice, have

HAVE BEEN. IF I DECIDE THAT THE QUESTION DEALS WITH A LEGAL ISSUE, I WILL ADDRESS THAT ISSUE IN MY FINAL INSTRUCTIONS IN THE EVENT IT IS RELEVANT TO YOUR CONSIDERATION OF THE CASE.

AT NO TIME DURING THE TRIAL MAY ANY JUROR POSE QUESTIONS ORALLY TO A WITNESS. MOREOVER, YOU MAY POSE A QUESTION TO A WITNESS ONLY TO ELICIT INFORMATION, NOT TO DISCREDIT OR ARGUE WITH THE WITNESS.

This court's 1982 survey of jurors (*see* note 5, *supra*) inquired, *inter alia,* whether jurors thought that the opportunity to submit written questions to witnesses would have been helpful in the cases in which they sat. 80% of the jurors who responded answered affirmatively. The portion of the survey with reference to submission of questions to witnesses (including all comments received) is included as *Appendix C* to this Memorandum and Order.

**18.** No District of Columbia case appears to have addressed the issue.

Federal cases holding that trial courts did not err in permitting jurors to pose questions to witnesses include *United States v. Callahan, supra, United States v. Gonzalez,* 424 F.2d 1055, 1056 (9th Cir.1970), and *United States v. Witt,* 215 F.2d 580, 584 (2nd Cir.1954). In *Witt,* Judge Jerome Frank (quoted approvingly by defendants regarding the purported ineffectiveness of curative instructions, "Opposition", p. 14), concluded for a unanimous circuit panel, like Judge Clark in *Callahan,* that whether to allow jurors to question witnesses was within the trial court's discretion. 215 F.2d at 584. No federal cases hold to the contrary. In *United States v. Evans,* 542 F.2d 805, 812–13 (10th Cir.), *cert. denied,* 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1976), the court found no error in the trial judge's refusal to permit jurors to take notes or ask questions, concluding that these were "matters within the discretion of the trial court." 542 F.2d at 813.

Appellate courts in at least twelve states have taken the view that whether to permit jurors to submit questions to witnesses in a criminal case is within the trial court's discretion. *See, e.g., State v. LeMaster,* [137 Ariz. 159] 669 P.2d 592, 596–98 (Ariz.Ct.App.1983); *People v. Stout,* [116 Mich.App. 726] 323 N.W.2d 532, 535–36 (Mich. Ct.App.1982); *State v. Barrett,* [278 S.Ct. 414] 297 S.E.2d 794, 795–96 (S.C.1982); *Cheeks v. State,* [266 Ind. 190] 361 N.E.2d 906, 910 (Ind. 1977); *Scheel v. State,* 350 So.2d 1120, 1121 (Fla.App.1977); *Nelson v. State,* [257 Ark. 1] 513 S.W.2d 496, 498 (Ark.1974); *People v. Heard,* [388 Mich. 182] 200 N.W.2d 73, 76 (Mich.1972); *State v. Sheppard,* [100 Ohio App. 345] 128 N.E.2d 471, 499 (Ohio 1955); *People v. Knapper,* [230 App.Div. 487] 245 N.Y.S. 245, 251 (N.Y.App. Div.1930); *Stamp v. Commonwealth,* [200 Ky. 133] 253 S.W. 242, 246 (Ky.1923); *State v. Kendall,* [143 N.C. 659] 57 S.E. 340, 341 (N.C.1907); *State v. Crawford,* [96 Minn. 95] 104 N.W. 822 (Minn.1905). Several other state appellate courts have concluded that while the practice does not constitute error, it is not to be encouraged. *See, e.g., Lucas v. State,* 381 So.2d 140 (Miss.1980); *Raynor v. State,* [1 Tenn.Cr.App. 556] 447 S.W.2d 391, 393 (Tenn.Cr.App.1969); *State v. Anderson,* [108 Utah 130] 158 P.2d 127, 128–29 (Utah 1945). Only one state appears to prohibit the practice, *Hall v. State,* [241 Ga. 252] 244 S.E.2d 833 (Ga.1978), while another has held that it is reversible error to instruct jurors that they are prohibited from asking questions during trial. *Carter v. State,* [250 Ind. 13] 234 N.E.2d 650, 652 (Ind.1968).

*See also* Harms, *The Questioning of Witnesses by Jurors* (hereafter, "Harms"), 27 Am.U.L.R. 127 (1977); Annot., "Propriety of Jurors Asking Questions in Open Court During Course of Trial", 31 A.L.R.3d 872 (1968).

been marked by highly improper juror or judicial conduct.[19]

There are sound reasons to permit the questioning of witnesses by jurors if the procedure is undertaken with careful judicial control. As the court in *Callahan* observed, it "makes good common sense" to permit a juror to ask a question about a matter which, in the juror's mind, needs clarification. *United States v. Callahan, supra*.[20] Moreover, counsel and the court both may be alerted to particular factual issues that need exploration or more extensive development. *Id.;* Harms, *supra*, note 18, 27 Am.U.L.R. at 131. Questions by jurors also may bring to the court's and counsel's attention *improper* concerns which can be promptly addressed with cautionary instructions, admonishing the juror who asked the question that the matter is not relevant to the case and should not be brought to the attention of other jurors or play any part in the inquiring juror's consideration of the case.[21] Additionally, as the *Callahan* court also noted, consistent with repeated appellate averments in the District of Columbia, "[t]rials exist to develop truth", *Id.;*[22] and it seems indisputa-

**19.** In *State v. Martinez,* [7 Utah 2d 387] 326 P.2d 102 (Utah 1958), the trial judge invited and encouraged jurors to ask questions, "even inviting them, after retiring to deliberate, to question a witness who had not been called by either prosecution or defense, resulting in an indiscriminate posing of more than 50 questions to such witnesses by various jurors." 326 P.2d at 103. While reversing the defendant's conviction, the Utah Supreme Court noted that it previously had "approved the principle that, within sound discretion, the trial court might permit jurors to ask an unsolicited question ..." *Id.* In *Rojas v. Vuocolo,* [142 Tex. 152] 177 S.W.2d 962 (Tex.1944), it was held to be reversible error to permit a codefendant in a civil case, over the objection of another codefendant, to answer a juror's question as to whether he was protected by liability insurance. In *Krause v. State,* [75 Okl.Cr. 381] 132 P.2d 179 (Okla.1942), while recognizing the propriety of juror questions under some circumstances, the court found reversible error where a juror assumed the role of the prosecutor, asking prejudicial and argumentative questions reflecting that the juror had become prejudiced against the defendant. In *State v. Sickles,* [220 Mo.App. 290] 286 S.W. 432 (Mo.1926), the trial court's failure to halt a juror who asked questions about the defendant's citizenship and nativity was found to constitute reversible error. *See also Story v. State,* [157 Ga.App. 490] 278 S.E.2d 97 (Ga.1981) (error to permit two jurors to question seven-year-old child molestation victim over defense counsel's objection).

**20.** *See also* Harms, *supra,* note 18, 27 Am.U.L.R. at 130; Forston, *Sense and Non-Sense: Jury Trial Communication,* 1975 B.Y.L.R. 601, 628–29; *Stamp v. Commonwealth, supra,* note 18; *Louisville Bridge and Terminal Co. v. Brown,* [211 Ky. 176] 277 S.W. 320 (Ky.1925); *Schaefer v. St. Louis and Suburban R. Co.,* [128 Mo. 64] 30 S.W. 331 (Mo.1895).

**21.** One of the major concerns raised by defendants in their Opposition is that jurors "will put

many questions which are legally improper." "Opposition", p. 13. While defendants' apprehensions in this regard do not comport with this court's limited experience in utilizing this procedure, nevertheless, to the extent such fears are realistic they present a strong argument in *favor* of the court's procedure. Defendants theorize that "where the jury is not encouraged to articulate these [improper] concerns the risk they will determine outcomes is reduced ..." "Opposition", p. 15. Such a head-in-the-sand perspective not only is entirely speculative, but is at odds with the more realistic probability that improper matters which concern jurors are more likely to taint jury deliberations if left unaddressed and unchecked than if discovered and confronted by a strong admonition from the trial judge.

**22.** Significantly, defendants disparage the truth-finding goal of criminal trials, citing only a law review article in support of the proposition that the idea that criminal trials are used for "purposes other than those of establishing the truth and enforcing the substantive criminal law" is the *"idee recue* in the common law tradition." "Opposition", p. 9, n. 4. Indeed, in a candid comment during oral argument, defendants' counsel acknowledged that "[i]n many, many cases the truth that we are satisfied with and that we want in criminal trials is not a special verdict that says what happened. It is never that. It is virtually never that in criminal cases." *See* Transcript of Proceedings of January 28, 1985 (hereafter, "Transcript"), p. 32.

In fact, of course, the law in this jurisdiction is that a "criminal trial ... is a quest for the truth." *Gregory v. United States,* 125 U.S.App. D.C. 140, 143, 369 F.2d 185, 188 (1966). The judicial process is not "an adversary game" but a "search for the truth." *Middleton v. United States,* 401 A.2d 109, 116, n. 11 (D.C.1979). *See also Washington v. United States,* 404 A.2d 197, 200 (D.C.1979) ("Criminal trials remain a search for the truth ...", citing *United States v. Steven-*

ble that the increased effectiveness of communication with jurors that will result if they are permitted to pose questions to witnesses will aid in finding the truth. As one of the most recent and thorough commentaries on the questioning of witnesses by jurors observed: [23]

> Only when evidence and issues are communicated successfully to jurors can they begin to fulfill their duty to seek truth and deliver a just verdict. But, because the jury is relegated to a passive role, communication in a trial is basically a one-way system—a system notably lacking in ability to insure a reliable com-

munication of evidence or issues to the jury.

Allowing jurors to ask questions of witnesses would promote better and more reliable communication, because a two-way system provides for constant clarification of messages being sent. Understanding testimony more clearly, jurors thus would be able to fulfill their basic function of finding the facts in dispute. Harms, *supra,* note 18, 27 Am. U.L.R. at 160.

Finally, there is reason to believe that permitting receivers of information, *e.g.,* jurors, to ask questions enhances not only their ability to understand what is being

---

*son,* 138 U.S.App.D.C. 10, 13–14, 424 F.2d 923, 926–27 (1979 [1970] )).

Thus, in the past twenty years the Supreme Court has approved procedures designed to enhance the search for truth in criminal trials, while criticizing and limiting procedures with the contrary effect—and reversing convictions where the defendant was prejudiced by actions which inhibited the search for truth. *See, e.g., Williams v. Florida,* 399 U.S. 78, 82 [90 S.Ct. 1893, 1896, 26 L.Ed.2d 446] (1970) (upholding constitutionality of an alibi notice rule as "designed to enhance the search for truth"); *Rakas v. Illinois,* 439 U.S. 128, 137 [99 S.Ct. 421, 427, 58 L.Ed.2d 387] (1978) (limiting an accused's standing to move to suppress evidence and criticizing the exclusionary rule as "deflect[ing]" the search for truth); *Estes v. Texas,* 381 U.S. 532, 551 [85 S.Ct. 1628, 1637, 14 L.Ed.2d 543] (1965) (holding that trial publicity, failure of trial judge to control proceedings, and televising of hearing "inherently prevented a sober search for the truth"); *Wardius v. Oregon,* 412 U.S. 470, 475–76 [93 S.Ct. 2208, 2212–13, 37 L.Ed.2d 82] (1973) (reversing a conviction where prosecution obtained names of defendant's alibi witnesses but did not provide reciprocal discovery, and observing that the "[s]tate may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game' secrecy for its own witnesses").

**23.** Harms, *supra,* note 18, described in some detail how the opportunity of jurors to pose questions helps the jury fulfill its factfinding function by permitting two-way communication which, in turn, is *more accurate* communication:

> The jury's basic function is to determine questions of fact arising in a trial. Jurors are required to fulfill this function within established trial procedure, which calls for the parties involved to marshal evidence in court

while a jury listens. A major problem with this process is that it does not promote effective communication between attorneys who present evidence and jurors who receive it. As a result, the jury is prevented from fulfilling its factfinding function.

In ordinary conversation, mesages travel in both directions. One person sends a message; the other is stimulated and responds. *This dynamic quality comprises an essential element of accurate communication. It produces a mechanism for refining and clarifying each message to insure that a receiver has understood a sender's meaning.* In common convresation, a party who fails to understand a message can always request clarification or repetition to obtain a reliable communication.

Conversely, a one-way communication process prohibits a receiver from respoding to a sender, and invariably results in distortion of the principle [*sic* ] mesage. A jury trial typlifies one-way communication in operation because jurors ordinarily cannot respond to the stimuli produced by witnesses and attorneys. As a one-way communication process, a jury trial creates problems that do not arise under a two-way system. First, *it is impossible to determine whether jurors understand the evidence. As long as they sit in silence, jurors, even though they may be confused, convey no indication that evidence is too complicated, or that it is being elicited too quickly, or that anything is wrong with the presentation....*

*The communication process is vital and goes to the very heart of the jury system. If jurors fail to understand facts, or if they are confused or bewildered by evidence or procedure, they cannot be expected to pass judgment rationally. Consequently, their basic factfinding function cannot always be fulfilled....* Harms, *supra,* note 18, 27 Am.U.L.R. at 129–132. (Emphasis added; citations omitted throughout quoted portions.)

communicated, but results in their putting forth more effort to listen and to understand because they *know* they may ask questions.[24] A concomitant benefit predictable from these effects might well be a reduced likelihood that the court will be required to intervene to question witnesses or elucidate issues that are clarified by juror questions.[25]

Notwithstanding the prospect that permitting jurors to submit questions to witnesses is likely to enhance both the search for truth in a trial and the knowledge, motivation and understanding with which jurors pursue that search, it is beyond dispute that the questioning of jurors by witnesses also may present potential dangers

unless the trial judge exercises careful control over the process from the outset of trial.

First, it is essential that jurors not be permitted to question witnesses orally. Oral questioning by jurors not only effectively eliminates the judge's ability to confine potentially prejudicial concerns of a single juror to that juror, but, as defendants assert, may place counsel who wishes to object to a juror question in an embarrassing and difficult position. *See Raynor v. State, supra,* note 18, 447 S.W.2d at 393. Directing that jurors reduce to writing their questions effectively addresses these concerns.[26] *See State v. Barrett, supra,*

**24.** It hardly is surprising that it generally is thought that the opportunity for students in an educational environment to ask questions plays "a significant role in learning"; indeed, recent pedagogical literature places increased emphasis on the need for more student questioning to enhance the learning process. *See* Dillon, "The Multidisciplinary Study of Questioning", 74 *Journal of Educational Psychology* 147, 153 (1982).

Dr. Gordon I. Zimmerman, a Professor of Speech and Theatre at the University of Nevada at Reno who has written and lectured extensively on speech communication and has served on the faculty of the National Judicial College for eleven years, emphasizes in his presentations to new trial judges the importance of "two way communication" in the courtroom. Two-way communication, in his view, (1) imparts information more accurately, (2) encourages "receivers" of information to pay more attention to "senders", (3) enhances the chance that receivers of information will be able to clarify what they *think* they hear, and (4) increases the effort put forth by listeners to accurately understand what they hear because they *know* they may ask questions if they do not understand. *See also* Harms, *supra,* note 23.

**25.** Defendants acknowledge what long has been the law in the District of Columbia—that "principles both fundamental and indestructable in our criminal law exort [*sic*] [the judge] to hold to a minimum his questioning of witnesses in a jury trial." "Opposition", p. 11, quoting from *United States v. Barbour,* 137 U.S.App.D.C. 116, 118, 420 F.2d 1319, 1321 (1969). From this principle, however, defendants proceed to infer that questioning by *jurors* "threatens to undo the critical balance of the adversary system ..." *Id.* That, of course, was *not* the point addressed by *Barbour;* rather, the Circuit Court there was

concerned about the *impact on the jury* of *judicial* questioning of witnesses—that an "assumption of guilt" might be "radiated by overzealous quizzing by the *judge,* and the right to fair trial ... imperilled by an apparent breach of the atmosphere of *judicial* even-handedness that should pervade the courtroom." *Id.* (Emphasis added.) It is precisely this threat which any procedure that may *reduce* the need for judicial questioning will ameliorate; and the desirability of such procedures is enhanced by evidence that even non-verbal—and indeed, unconscious—judicial intervention in trials probably has a significant influence on jury behavior. *See* Note, *Judges' Nonverbal Behavior in Jury Trials: A Threat to Judicial Impartiality,* 61 U.Va.L.R. 1266 (1975). Thus, it is difficult to square defendants' preference that the judge rather than the jury question witnesses with their concern that the "critical balance of the adversary system" not be undone. *Compare* "Opposition", p. 11, with "Opposition", p. 17.

**26.** Defendants assert that even though the procedure used by this court requires the submission of questions in writing and their discussion with counsel at the bench out of the presence of the jury, jurors "who have propounded questions will certainly focus carefully on bench conferences to see which side is objecting to their question", so that who objected "will be obvious to the juror who asked the question." "Opposition", p. 16.

Defendants' argument is without merit. They assert no grounds upon which this court should presume either that jurors attempt or are able to discern what goes on at a bench conference—a procedure which is used in virtually every case tried in the Superior Court in order to *avoid* the very consequence defendants would ask this court to *presume* occurs. Moreover, in each instance in which a juror submits a written

note 18, 297 S.E.2d at 795; *Cheeks v. State, supra,* note 18, 361 N.E.2d at 910; *A Handbook for Petit Jurors* (hereafter, *"Handbook"*), p. 28 (Circuit Administrative Judges of Maryland, 1979, revised 1981).[27]

Second, questions submitted by jurors should be discussed with counsel at the bench out of the presence of the jury, and counsel afforded an opportunity to interpose objections prior to the questions being posed to witnesses. *See State v. Barrett, supra,* note 18, 297 S.E.2d at 795–96; *Cheeks v. State, supra,* note 18, 361 N.E.2d at 910; *State v. LeMaster, supra,* note 18, 669 P.2d at 597. In this fashion objections to questions "irrelevant or clearly improper and prejudicial to the rights of either party" may be sustained by the court without embarrassment to counsel. *State v. LeMaster, supra;* note 26, *supra.*

Third, jurors should be permitted to submit questions only at the close of the examination of a witness so as to avoid interrupting or distracting counsel or other jur-

ors, and to maximize the possibility that issues of concern to jurors will be addressed by counsel's examination and therefore will not prompt unnecessary inquiries by jurors. *See State v. Barrett, supra,* note 18, 297 S.E.2d at 795; Devitt and Blackmar, *Federal Jury Practice and Instructions,* vol. 1, p. 267 (3rd ed. 1977).[28]

Fourth, in the event the court decides to pose one or more questions submitted by jurors, counsel should be afforded an opportunity to ask additional questions in any areas that might be opened by the jurors' question(s) or the witness's answer(s) to the question(s). *See State v. LeMaster, supra,* note 18, 669 P.2d at 597.[29]

Fifth, it would seem wise to avoid, where possible, the disclosure to the jury of the juror who posed a particular question. This might alleviate embarrassment of a juror whose question was not asked.

Finally, it is of critical importance that the jury be instructed carefully both at the outset of trial regarding the proper proce-

question in accord with its procedures, the court invariably inquires of *both* counsel at the bench concerning their views, and may discuss at length with a non-objecting lawyer his or her views as to the position of the objecting lawyer. Thus, defendants' apprehension that jurors will *figure out who opposes a question by observing* who talks the longest at the bench conference is wholly unfounded.

**27.** The Maryland *Handbook* instruction reads:

Sometimes a juror may himself wish to ask a question of a witness after examination by counsel for both parties has been completed. Such questions are usually not necessary and are proper only for the purpose of getting information, and not for the purpose of discrediting or arguing with the witness. However, if a juror has a question which he feels should be asked, he should write his question *and present it to the judge upon the conclu-*sion of the examination of the witness. The court will then ask the question if the information sought is material to the issue and admissible under the rules of evidence. *Handbook, supra* at 28.

**28.** Among their general instructions for criminal cases in federal courts, Devitt and Blackmar, apparently anticipating that some judges will permit oral questions by jurors, include the following:

This court does not have a rule against the asking of questions by jurors, but in my experience, there should be careful rules about the asking of such questions. Please withhold any questions until after a witness has completed his testimony. Do not interrupt the examination of a witness in order to ask a question. When a witness has finished his testimony then, if there is some substantial question in your mind, you may address an inquiry to the court. Please do not address either the witness or any lawyer, but confine your inquiry to the court. On the other hand, if you have difficulty hearing a witness or a lawyer, please raise your hand immediately and the court will take corrective action. Devitt and Blackmar, *supra.*

**29.** In their Opposition, defendants assert that "the court's permission to the lawyers to ask follow up questions is a non-offer. No lawyer is *going to ask questions to unsettle an answer* given by a witness when a juror propounded the question." "Opposition", p. 16.

Defendants' argument that, a juror somehow will be offended if counsel follows up the juror's question with further examination of the witness is without support and wholly speculative; indeed, it might just as reasonably be argued that a juror would be flattered that a lawyer felt the juror's question to be so probative that it raised issues worthy of further exploration by counsel.

dure for submitting questions to witnesses, and during trial in the event the trial judge declines, for whatever reason, to pose a juror's question to a witness.

The preliminary instruction should apprise the jury that:

(1) generally only the lawyers and the judge ask witnesses questions, and that if jurors are patient, matters of concern to them will probably be covered by counsel's questions;[30]

(2) jurors are not encouraged to pose questions to witnesses;[31]

(3) in the event a juror has a question, the question may be written out and submitted to the judge after counsel have finished examining a witness;[32]

(4) the judge will decide if the question is a legally proper one after consulting with the lawyers, and will put the question to the witness if it is proper;[33]

(5) if the judge does not ask the question, the juror who asked it should not guess or speculate why the question was not asked, and should neither consider the question nor discuss it with the other jurors during deliberations;[34]

(6) oral questions never may be asked of witnesses during the trial;[35]

(7) questions may be asked of witnesses only to clarify evidence or elicit information, not to discredit or argue with a witness, because jurors are impartial judges of the facts, not advocates for either side;[36] and

**30.** *See State v. Barrett, supra,* 297 S.E.2d at 795, quoting with approval from *The State Trial Judge's Book* (National Conference of State Trial Judges and the Joint Committee for Effective Administration of Justice, 1965); *Pattern Criminal Jury Instructions,* No. 2B, p. 6 (Report of the Federal Judicial Center Committee to Study Criminal Jury Instructions, Federal Judicial Center, June, 1982); note 17, *supra.* The Federal Judicial Center Committee drafted two alternative instructions concerning questioning of witnesses by jurors, depending upon whether the trial judge determines to permit such questioning.

*Alternative A* provides:
The only persons who may ask questions of witnesses are the lawyers and myself. You are not permitted to ask questions of witnesses.
*Alternative B* provides:
Generally only the lawyers and I ask questions of witnesses. If you feel that an important question has not been asked, you may put the question in writing and have it handed to me. I will then decide if the question is a proper one. If it is, I will ask the question of the witness.

**31.** *See State v. Barrett, supra; United States v. Callahan, supra,* 588 F.2d at 1086; *Cheeks v. State, supra;* note 17, *supra.*

**32.** *See State v. Barrett, supra; Cheeks v. State, supra;* Maryland *Handbook, supra,* note 27; *Pattern Criminal Jury Instructions, supra;* notes 17 and 28, *supra.*

**33.** *See State v. Barrett, supra; State v. LeMaster, supra; Pattern Criminal Jury Instructions, supra;* note 17, *supra.*

**34.** *See* note 17, *supra. See also Criminal Jury Instructions for the District of Columbia,* No. 1.02, p. 7 (3rd ed. 1978) ("If, during the course of the trial, I sustain an objection by one counsel to a question asked by the other counsel, you are to disregard the question and you must not speculate as to what the answer would have been."). The instruction presently utilized by the court (*see* note 17, *supra* ) does not contain the second clause of this admonition; however, it clearly seems wise and will be included in the amended version of the instruction, *infra,* to be given in these cases. *Compare Pattern Criminal Jury Instructions, supra,* No. 9, p. 14 ("[W]hen I told you not to consider a particular statement, you were told to put that statement out of your mind, and you may not refer to that statement in your deliberations.").

**35.** *See* notes 17, 26, 27 and 32, *supra.*

**36.** *See* Maryland *Handbook, supra; A Handbook for Jurors,* p. 26 (Judicial Council of Virginia, 1975); note 17, *supra.* The Virginia instruction provides:
Jurors have the right, after first getting the permission of the judge, to ask questions of the witnesses whenever they do not understand the testimony. Such questions are proper only for the purpose of getting information and not for the purpose of discrediting or arguing with a witness. If the question is improper the lawyer whose side is hurt by it will have to object, and the juror must not allow such objection to prejudice him against the lawyer's client. *A Handbook for Jurors, supra,* p. 26.
This court's present instruction does not contain the admonitory language reminding the jury that they are judges, not advocates. How-

(8) just as jurors may not discuss the case among themselves or with anyone else prior to deliberations, so they may not discuss or devise among themselves, either in the courtroom or during recesses, questions to be posed to witnesses.[37]

Where the court declines to ask a juror-posed question during trial, the jury should be instructed that:

(1) the court has considered the question and does not know what the answer would be,[38] but will not ask it because it is legally improper; and

(2) the juror who submitted the question should strike it from his or her mind and not consider it or discuss it with other jurors during deliberations.[39]

In this court's view, a careful admonition to jurors that they are permitted but not encouraged to submit questions to be posed to witnesses, in accord with the procedures described above, is likely to enhance the prospect that juries will perform their responsibilities knowledgeably, intelligently, efficiently, and reliably.

While defendants apparently would have it otherwise,[40] it *is* important to the administration of justice that jurors find out, consistent with preserving the constitutional rights of litigants, what "really happened" in a case.

Defendants' arguments in opposition to the court's procedures, articulated with some distortion,[41] much indignation and exaggeration,[42] and rooted primarily in specu-

---

ever, this language seems prudent; it is likely that it will aid in keeping the jurors' understanding of their role in proper perspective, and discourage jurors from engaging in the kind of improper advocacy that presented a serious problem in at least one early case. *See Krause v. State, supra,* note 19. It also addresses defendants' concern that permitting jurors to ask questions may prompt them to develop a "stake" in the outcome of the case or begin "aligning themselves with one side or the other." Transcript, p. 27; "Opposition", p. 12. Consequently, the language has been added to the amended version of the court's instruction, *infra,* to be given in these cases.

**37.** *See State v. LeMaster, supra.* This language is not included in the court's present instruction (*supra,* note 17), but has been added to the amended version, *infra,* to be given in these cases because it seems sensible to make certain that the jurors understand that simply because they may pose questions to witnesses to clarify a point or elicit information does *not* mean that they may discuss the case among themselves for *any* reason—including developing questions—before they retire to deliberate, nor may they in effect begin their deliberations early by discussing potential questions to be put to witnesses. To the extent that defendants have a legitimate fear that permitting jurors to submit questions to witnesses may encourage jurors "prematurely to begin the deliberative process" ("Opposition", p. 12), this language also addresses that concern.

**38.** Defendants argue that the trial judge cannot tell the jury that he or she does not know what the answer to a question would be because that would amount to a misrepresentation to the jury. Transcript, p. 6. To the contrary, such a disclaimer not only appears to be a useful de-

vice to help prevent juror speculation about the possible answers to an improper question, but it can be stated with complete candor in most circumstances. Moreover, it hardly is different from other "sanitizing" procedures routinely utilized in criminal cases to keep prejudicial information from the jury (*e.g.,* redacting confessions in codefendant cases to avoid *Bruton* problems).

**39.** *See* note 34, *supra.*

**40.** *See* "Opposition", p. 18.

**41.** For example, there hardly is "agree[ment]" between "[b]oth proponents and opponents" of juror questioning that "it is an extremely dangerous practice" where done pursuant to carefully controlled procedures such as those used by this court; in fact, virtually *no authority* so holds. *Compare* "Opposition", p. 7.

Similarly, defendants plainly mischaracterize the reasons that prompt this court to permit jurors to submit questions to witnesses by contending that the "assumption underlying" the procedure "is simply an expression of dissatisfaction with the constitutional election to conduct trials by adversary process" ("Opposition", p. 17). *Compare* text, *supra,* pages 20–24.

**42.** Defendants' assertions that "permitting jury-posed questions rends an inquisatorial tear in the fabric of the adversarial system" ("Opposition", p. 10) and that this court "proposes to permit jurors to relieve the prosecutor of even the most elemental of his burdens—to elicit the evidence upon which a finding of guilt may rest" ("Opposition", p. 19) are but two examples of defendants' rhetorical hyperbole that bear little relationship to the realities of the proce-

lation,[43] find virtually no support in the Constitution, statutory law, or numerous court opinions that have considered juror questioning of witnesses. To the contrary, *no* federal or state court has found cause to question the constitutionality of the procedure, and almost all courts have found election of the procedure to be firmly committed to the discretion of the trial judge.[44] Commentators who have thoughtfully discussed juror questioning of witnesses commend it for many of the reasons that have

prompted this court to permit it,[45] and respected compilations of federal jury instructions,[46] as well as juror handbooks in adjoining jurisdictions,[47] acknowledge acceptance of the practice. While there well may be cases where, notwithstanding the sound reasons[48] that prompt this court to allow juror questions, it nevertheless would be wise for a trial judge, in the exercise of discretion, to dispense with the practice because of unique circumstances posing unusual dangers of prejudice to a party, none of defendants' cases present such dangers.[49]

dure they contest. Their suggestions that an oppressive, communist-like police state lies at the end of the road which begins with permitting jurors to ask questions (*see* "Opposition", p. 18, particularly n. 5), and that this court proposes to "engraft ... an inquisatorial mechanism" onto the adversary process are equally divorced from reality.

**43.** Defendants' argument that "questioning by jurors encourages them prematurely to begin the deliberative process" ("Opposition", p. 12) not only is speculative; it is but another variant on defendants' "sponge" theory of jury behavior. *See* page 993, *supra.* It is no more worthy of credence when applied to juror questioning than it is when applied to juror note taking.

Their contention that questions by jurors "designed to remove doubts or to buttress the government's case" violates the rule placing the burden of proof on the prosecution ("Opposition", p. 13) is no more persuasive than would be a similar argument in opposition to questioning by a judge during a court trial; indeed, defendants appear to have backed away from this contention during oral argument before the court. Transcript, p. 32.

Likewise, there is no support whatever for their prediction that the "routine practice of posing juror questions to witnesses will result in more convictions because it will undercut the adversary principles upon which our system of criminal justice rests." "Opposition", p. 18.

Finally, defendants' contention that "the practice of conducting juror-posed questioning will be extremely burdensome and unworkable" ("Opposition", p. 16) again relies on theory, not authority or experience. This court's limited experience with permitting such questioning in approximately ten trials lends no support to defendants' assertion.

*See also* notes 26 and 29, *supra.*

**44.** *See* note 18, *supra.*

**45.** *See* notes 18, 20, 23 and 24, *supra.*

**46.** *See* notes 28 and 30, *supra.*

**47.** *See* notes 27 and 36, *supra.*

**48.** *See* pages 988–990, *supra.*

**49.** Defendants' assertions of any prospective prejudice in their *particular* cases as a consequence of permitting juror questioning are little more than perfunctory.

No argument whatever is made on behalf of defendant Yeager in his written pleading (joined in by defendant Mitchell); however, during oral argument, counsel noted that these matters involve co-defendant cases, and that consequently there might be reason to fear possible prejudice from juror questions if one defendant testified and the other did not. Counsel also stated that a motion to suppress identification had been filed and that, if granted, it might lead to prejudicial questions from jurors.

Defendant Joe Wills (joined in by defendant Dione Wills) asserts in his pleading that jury questioning would be "particulary troublesome" in his case because (1) "challenges have been filed to the admissibility of statements and identification procedures", (2) the case involves co-defendants "whose defense theories will *likely* be inconsistent", (3) the co-defendants are related, (4) "one defendant *may* testify while the other *may* not", and (5) defendant Joe Wills has a prior criminal record. *Wills* "Opposition", p. 20. (Emphasis added.)

Defendants' assertions in each case are entirely speculative at this time. The court has not yet ruled on any pretrial suppression motions, and defendants Wills acknowledge only the *possibility* of conflicting defenses or that one or the other of them may or may not testify. Nevertheless, it of course warrants emphasis that this court's decision to permit juror questioning in these cases is without prejudice to reconsideration at a later time in the event there develop reasons to believe that a defendant might be prejudiced if jurors are permitted to submit questions to witnesses.

Consequently, defendants' requests that this court not instruct jurors as to the circumstances under which they are permitted to submit questions to witnesses will be denied, and the court will give the following modified instruction to jurors, consistent with the preceding discussion:[50]

GENERALLY ONLY THE LAWYERS AND I ASK WITNESSES QUESTIONS. IF YOU ARE CONCERNED ABOUT WHETHER A WITNESS WILL TESTIFY ABOUT A MATTER THAT SEEMS IMPORTANT TO YOU, USUALLY, IF YOU ARE PATIENT, THE MATTER WILL BE COVERED BY FURTHER QUESTIONS ASKED BY ME OR THE LAWYERS.

OCCASIONALLY, HOWEVER, A JUROR FEELS THAT AN IMPORTANT QUESTION HAS NOT BEEN ASKED. NOW I AM NOT ENCOURAGING ANY OF YOU TO POSE QUESTIONS TO THE WITNESSES IN THIS CASE. HOWEVER, IF IT HAPPENS DURING TRIAL THAT YOU FEEL AN IMPORTANT QUESTION HAS NOT BEEN ASKED, YOU MAY WRITE OUT THE QUESTION ON A BLANK PIECE OF PAPER FROM YOUR NOTEBOOK, RAISE YOUR HAND WHEN THE LAWYERS ARE FINISHED WITH THEIR EXAMINATION OF THE WITNESS, AND HAVE THE QUESTION HANDED TO ME. I THEN WILL DECIDE IF THE QUESTION IS A PROPER ONE AFTER CONSULTING WITH THE LAWYERS. IF IT IS, AND IF IT RELATES TO A FACTUAL MATTER ABOUT WHICH THE WITNESS CAN TESTIFY, I WILL ASK THE WITNESS THE QUESTION.

IF I DO NOT ASK THE QUESTION, THAT MEANS I HAVE DECIDED THAT IT IS NOT LEGALLY PROPER FOR SOME REASON, JUST LIKE I MIGHT SUSTAIN AN OBJECTION TO A QUESTION ASKED BY A LAWYER FOR THE SAME REASON. IF I DO NOT ASK THE QUESTION, THE JUROR POSING IT SHOULD NOT GUESS OR SPECULATE ABOUT WHAT THE ANSWER MIGHT HAVE BEEN, AND MAY NOT CONSIDER THE QUESTION OR DISCUSS IT WITH OTHER JURORS DURING DELIBERATIONS. IF I DECIDE THAT THE QUESTION DEALS WITH A LEGAL ISSUE, I MAY DECIDE TO WAIT UNTIL MY FINAL INSTRUCTIONS AND ANSWER IT THEN IF IT IS RELEVANT TO YOUR CONSIDERATION OF THE CASE.

NO JUROR EVER MAY POSE QUESTIONS ORALLY TO A WITNESS AT ANY TIME DURING THE TRIAL. MOREOVER, YOU MAY POSE A QUESTION TO A WITNESS ONLY TO HELP YOU UNDERSTAND THE TESTIMONY, TO CLARIFY THE EVIDENCE OR TO SEEK INFORMATION, NOT TO DISCREDIT OR ARGUE WITH A WITNESS. THIS IS BECAUSE YOU, AS JURORS, ARE IMPARTIAL JUDGES OF THE FACTS, NOT ADVOCATES FOR EITHER SIDE IN THIS TRIAL.

FINALLY, REMEBER THAT JUST BECAUSE YOU MAY SUBMIT QUESTIONS TO WITNESSES DOES NOT MEAN THAT YOU MAY DISCUSS THIS CASE WITH A FELLOW JUROR OR ANYONE ELSE BEFORE YOU BEGIN YOUR DELIBERATIONS. YOU MAY *NOT* DO SO, AS I ALREADY HAVE TOLD YOU, AND WILL REMIND YOU THROUGHOUT THIS TRIAL. THIS MEANS THAT YOU MAY NOT DISCUSS WITH A FELLOW JUROR OR ANYONE ELSE, EITHER HERE IN THE COURTROOM OR OUTSIDE, ANY QUESTION YOU MIGHT BE THINKING OF POSING TO A WITNESS.

If a question is submitted by a juror during one of defendants' trials and is not posed by the court because the question is

---

50. *See* notes 34, 36 and 37, *supra.*

---

determined to be legally improper, the court will instruct the jury as follows:[51]

> LADIES AND GENTLEMEN, I HAVE DECIDED NOT TO ASK THIS WITNESS A QUESTION WRITTEN OUT BY ONE OF THE JURORS BECAUSE THE QUESTION IS NOT LEGALLY PROPER. I DO NOT KNOW WHAT THE ANSWER TO THE QUESTION WOULD HAVE BEEN, AND I MUST DIRECT THE JUROR WHO SUBMITTED THE QUESTION NOT TO GUESS OR SPECULATE ABOUT THE ANSWER BECAUSE IT IS NOT RELEVANT TO YOUR CONSIDERATION OF THIS CASE. THAT JUROR MUST PUT THE QUESTION OUT OF HIS OR HER MIND AND MAY NOT CONSIDER IT OR DISCUSS IT WITH OTHER JURORS DURING DELIBERATIONS.

For the foregoing reasons, it is this 12th day of March, 1985, hereby

ORDERED that defendants' motions that the court not permit jurors to take notes or submit questions to witnesses during their trials, and that the court not instruct the jury before closing argument as to the purpose of argument and the impropriety of the expression of personal beliefs or opinions by counsel, be, and they hereby are, denied.

/s/ Henry F. Greene
HENRY F. GREENE
Judge

---

51. *See* notes 38 and 39, *supra,* and accompanying text.